[No. S060966. Apr. 6, 1998.]

DAWN D., Petitioner, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
JERRY K., Real Party in Interest.

## Counsel

Sharon J. Waters, Diane Catran Roth and Andrew I. Roth for Petitioner.

William C. Katzenstein, County Counsel, Robert M. Pepper, Principal Deputy County Counsel, and Lucy J. Furuta, Deputy County Counsel, for Respondent.

Lawrence J. La Rocca and Marjorie G. Fuller for Real Party in Interest.

## Opinion

**WERDEGAR, J.**—In this case we determine whether the presumption created by Family Code section 7611[1] and the standing rule embodied in

---

[1] Family Code section 7611 provides: "A man is presumed to be the natural father of a child if he meets the conditions provided in Chapter 1 (commencing with section 7540) or Chapter 3 (commencing with section 7570 [establishment of paternity by voluntary declaration]) of Part 2 or in any of the following subdivisions: [¶] *(a) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a judgment of separation is entered by a court.* [¶] (b) Before the child's birth, he and the

section 7630[2] constitutionally may be applied to preclude an alleged biological father from establishing his paternity of a child born during the mother's marriage to another man. The husband in this case is presumed to be the child's natural father, as the child was born during the marriage (§ 7611, subd. (a)) and he has received the child into his home and openly holds out the child as his natural child (§ 7611, subd. (d)). Because, however, the husband and wife were not cohabiting at the time of conception, the presumption is not conclusive. (See, e.g., *Steven W.* v. *Matthew S.* (1995) 33 Cal.App.4th 1108, 1114 [39 Cal.Rptr.2d 535]; *City and County of San Francisco* v. *Strahlendorf* (1992) 7 Cal.App.4th 1911, 1915 [9 Cal.Rptr.2d 817]; § 7540.)[3] The alleged biological father does not meet any of the statutory criteria for presumed fatherhood. He relies, instead, on an asserted constitutional liberty interest, protected as a matter of substantive due process, not to be denied the opportunity to establish a parental relationship with the child.

We conclude the alleged biological father in this case has no constitutionally protected liberty interest defeating California's statutory presumption favoring the husband.

---

child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and either of the following is true: [¶] (1) If the attempted marriage could be declared invalid only by a court, the child is born during the attempted marriage, or within 300 days after its termination by death, annulment, declaration of invalidity, or divorce. [¶] (2) If the attempted marriage is invalid without a court order, the child is born within 300 days after the termination of cohabitation. [¶] (c) After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and either of the following is true: [¶] (1) With his consent, he is named as the child's father on the child's birth certificate. [¶] (2) He is obligated to support the child under a written voluntary promise or by court order. [¶] *(d) He receives the child into his home and openly holds out the child as his natural child.* [¶] (e) If the child was born and resides in a nation with which the United States engages in an Orderly Departure Program or successor program, he acknowledges that he is the child's father in a declaration under penalty of perjury, as specified in Section 2015.5 of the Code of Civil Procedure. This subdivision shall remain in effect only until January 1, 1997, and on that date shall become inoperative." (Italics added.)
   All further statutory citations are to the Family Code unless otherwise specified.
   [2]Section 7630, subdivision (a), provides: "A child, the child's natural mother, or a man presumed to be the child's father under subdivision (a), (b), or (c) of Section 7611, may bring an action as follows: [¶] (1) At any time for the purpose of declaring the existence of the father and child relationship presumed under subdivision (a), (b), or (c) of Section 7611. [¶] (2) For the purpose of declaring the nonexistence of the father and child relationship presumed under subdivision (a), (b), or (c) of Section 7611 only if the action is brought within a reasonable time after obtaining knowledge of relevant facts. After the presumption has been rebutted, paternity of the child by another man may be determined in the same action, if he has been made a party."
   [3]Section 7540 provides: "Except as provided in Section 7541, the child of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage."

## FACTS AND PROCEDURAL POSTURE

Our recitation of facts is drawn from the trial court's findings and the parties' pleadings.

Dawn D. and her husband, Frank F., were married in June 1989. In early January 1995 Dawn separated from her husband and began living with Jerry K. Dawn became pregnant the following month. In April 1995 she moved out of Jerry's household and returned to her husband. In August 1995 Jerry filed the complaint in the present action to establish a parental relationship and seeking eventual visitation with the as-yet unborn child. In anticipation of his assuming fatherly responsibilities, Jerry completed a parenting course. On November 9, 1995, Dawn gave birth to a son, who has resided with Dawn and Frank ever since that time. Jerry attempted to negotiate with Dawn and Frank an agreement for child support and visitation, but the parties have not effectuated such an agreement.

Dawn moved for judgment on the pleadings. She argued Jerry could not assert a valid claim to be the father of her son, inasmuch as her husband is presumptively the child's natural father and California law recognizes only one natural father for any child. She further contended Jerry was not within the class of persons granted standing to seek blood testing under the Family Code. Finally, she contended the state's interest in the integrity and preservation of the family unit outweighed Jerry's interest in establishing his paternity of her son.

The trial court denied Dawn's motion. Relying on *Michael M.* v. *Giovanna F.* (1992) 5 Cal.App.4th 1272 [7 Cal.Rptr.2d 460] and *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*), the court found that because Jerry had done all he could to demonstrate a commitment to his parental responsibilities, he had established "due process rights" that must be balanced against the state's interest in enforcing the statutory presumption in favor of Frank. The trial court noted the state's continuing interest in the welfare of the child and in family stability, an interest best exemplified in the conclusive presumption contained in section 7540, which allows parentage to be challenged by someone other than the husband or wife only in exceptional circumstances. The trial court reasoned, however, that the inapplicability of section 7540 in this case supports an inference "the [L]egislature perceived a decreased threat to the family stability if a wife is not cohabiting with her husband at the time of the conception." The court therefore concluded Jerry should be permitted to try to establish he is the child's biological father and, to that end, granted Jerry's motion for blood testing.

Dawn petitioned the Court of Appeal, seeking a stay of further proceedings and a writ of mandate to compel the trial court to vacate its order denying her motion for judgment on the pleadings and enter a new order granting the motion. The Court of Appeal invited Jerry to file a response and notified the parties that unless good cause were shown it might issue a peremptory writ in the first instance. (See *Palma* v. *U. S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 180 [203 Cal.Rptr. 626, 681 P.2d 893].) After consideration of the parties' responsive papers, the Court of Appeal summarily denied the petition.

We granted Dawn's petition for review, directed respondent court to show cause before this court why the relief sought in the petition for writ of mandate should not be granted, and stayed all proceedings in the superior court pending final determination of this cause.

## DISCUSSION

The Uniform Parentage Act, section 7600 et seq. (the Act), provides the framework by which California courts make paternity determinations. (§ 7610, subd. (b).) Under section 7611 of the Act, a man is presumed the natural father of a child born during, or within 300 days after the termination of, his marriage to the child's mother. (§ 7611, subd. (a).) He also attains the status of presumed father if he receives the child into his home and openly holds out the child as his natural child. (§ 7611, subd. (d).) By either of these provisions, Dawn's husband, Frank, is presumed the father of the child involved in this litigation.[4] Jerry, by contrast, meets none of the statutory conditions for presumed fatherhood: He has neither married nor attempted to marry Dawn, nor, despite his considerable efforts to assert parental rights, has he actually received the child into his home. (§ 7611; see *Kelsey S., supra,* 1 Cal.4th 816, 826-830 [declining to recognize doctrine of constructive receipt of child into man's home].)

The presumptions arising under section 7611 are rebuttable presumptions affecting the burden of proof and may be rebutted in an appropriate action by clear and convincing evidence. (§ 7612, subd. (a).) The Act, however, restricts standing to challenge the presumption of a *husband's* paternity to the child, the child's natural mother, or a presumed father. (§ 7630, subd.

---

[4]Had Frank and Dawn been cohabiting at the time of the child's conception (see, e.g., *Steven W.* v. *Matthew S., supra,* 33 Cal.App.4th 1108; *City and County of San Francisco* v. *Strahlendorf, supra,* 7 Cal.App.4th 1911), Frank's paternity would be "conclusively" presumed (§ 7540). Although the presumption arising from the birth of a child to a wife cohabiting with her husband is denominated "conclusive," in fact the presumption is subject to challenge under certain circumstances not relevant here. (See §§ 7540, 7541, subds. (b), (c).)

(a); cf. § 7631.)[5] The Act thus precludes Jerry from bringing this paternity action and, therefore, from compelling Dawn and the child to submit to blood tests to resolve the question of biological parenthood. (See §§ 7551 [court may order blood tests in a civil action or proceeding in which paternity is a relevant fact], 7554 [governing determinations of paternity based on blood tests].)

█ Jerry does not argue he has statutory standing to bring this action; his argument is directed to the proposition that a biological father has a liberty interest, protected as a matter of substantive due process, in being permitted to develop a parental relationship with his offspring. The Act, he contends, is therefore unconstitutional to the extent it deprives him of the opportunity to establish his parenthood.

A preliminary question is the nature of our inquiry in the case of a substantive due process challenge to the Act. California courts have examined substantive due process claims to a right to establish parenthood on a case-by-case basis. █ "As our discussions have indicated, the reasonableness of a statutory limitation on the right to offer proof of parentage depends on circumstances prevailing in each particular case. Accordingly, a court, before receiving evidence thereof, must in each instance make a preliminary determination, as by offer of proof, that due process concepts would be offended if the particular claimant to parentage were denied an

---

[5]As noted (see fn. 2, *ante*), section 7630, subdivision (a), grants standing only to the child, the child's mother, or a man presumed to be the child's father as a result of his marriage to the child's mother to bring an action to declare the existence or nonexistence of the father and child relationship presumed as a result of the mother's marriage to the presumed father. Thus, even if Jerry had himself become a presumed father under subdivision (d) of section 7611 by receiving and acknowledging the child, subdivision (a) of section 7630 would not confer on him standing to challenge the paternity of another whose presumed fatherhood was based on marriage to the child's mother at the time the child was born.

Section 7630, subdivision (b), by contrast, allows "[a]ny interested party" to bring an action to determine the existence or nonexistence of the father and child relationship presumed under subdivision (d) of section 7611. No reported cases have interpreted this provision in light of facts similar to those present here. Arguably, Jerry would qualify as an "interested party" for purposes of bringing an action to establish Frank's nonpaternity under subdivision (d) of section 7611. Such an action, however, whatever its outcome, would appear neither to affect Frank's status as a presumed father under subdivision (a) of section 7611 nor to confer on Jerry presumed father status. (See also § 7635, subd. (b) [in an action to determine the paternity of a presumed father, the mother, each presumed father, and any alleged natural father must receive notice and an opportunity to be heard, and may be made parties].)

Section 7631 provides in pertinent part: "Except as to cases coming within [the conclusive presumption of section 7540], a man not a presumed father may bring an action for the purpose of declaring that he is the natural father of a child having a presumed father under Section 7611, if the mother relinquishes for, consents to, or proposes to relinquish for or consent to, the adoption of the child." Because Dawn is not relinquishing for or consenting to her child's adoption, section 7631 has no relevance to this case.

opportunity to prove his claim." (*In re Lisa R.* (1975) 13 Cal.3d 636, 651, fn. 17 [119 Cal.Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017]; see also *Michelle W.* v. *Ronald W.* (1985) 39 Cal.3d 354, 360 [216 Cal.Rptr. 748, 703 P.2d 88].)

Dawn forcefully argues that such a method of analysis runs the risk of merely substituting this court's policy choices for those of the Legislature. As the United States Supreme Court recently noted in a different context, "[W]e 'ha[ve] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.' [Citation.] By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore 'exercise the utmost care whenever we are asked to break new ground in this field,' [citation], lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of this Court, [citation]." (*Washington* v. *Glucksberg* (1997) __ U.S. __, __ [117 S.Ct. 2258, 2267-2268, 138 L.Ed.2d 772, 787] [upholding, against Fourteenth Amendment challenge, Washington statute criminalizing the act of causing or assisting a suicide].)

We are sympathetic to the democratic motivation underlying the cautious attitude of the authority just quoted. Nevertheless, if the judiciary is to fulfill its role in our tripartite system of government as the final arbiter of constitutional issues, it cannot hope to escape the tension between legislative policy determinations and the challenges raised by those who would seek exceptions thereto. We can, however, while entertaining such challenges, seek to hold the tension in check by always presuming the constitutional validity of legislative acts and resolving doubts in favor of the statute. (*Amwest Surety Ins. Co.* v. *Wilson* (1995) 11 Cal.4th 1243, 1252 [48 Cal.Rptr.2d 12, 906 P.2d 1112].)

The due process clause of the Fourteenth Amendment to the federal Constitution provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." (U.S. Const., 14th Amend., § 1.) The United States Supreme Court has long recognized that this provision is not only a guarantee of *procedural* due process, but also *substantively* protects certain liberties from state infringement except when justified by the most compelling reasons: "[A] 'substantive due process' claim relies upon our line of cases which interprets the Fifth and Fourteenth Amendments' guarantee of 'due process of law' to include a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the

infringement is narrowly tailored to serve a compelling state interest." (*Reno v. Flores* (1993) 507 U.S. 292, 301-302 [113 S.Ct. 1439, 1447, 123 L.Ed.2d 1].) ■ The high court has recognized that the liberty interests protected by the due process clause are broader than just the freedom from physical restraint: "In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the rights to marry . . . ; to have children . . . ; to direct the education and upbringing of one's children . . . ; to marital privacy . . . ; to use contraception . . . ; to bodily integrity . . . ; and to abortion." (*Washington v. Glucksberg, supra,* __ U.S. at p. __ [117 S.Ct. at p. 2268, 138 L.Ed.2d at p. 787], citations omitted.)

The United States Supreme Court has developed the following methodology for deciding whether an asserted interest is a fundamental liberty interest protected by due process: First, the court must make a " 'careful description' of the asserted fundamental liberty interest." (*Washington v. Glucksberg, supra,* __ U.S. at p. __ [117 S.Ct. at p. 2268, 138 L.Ed.2d at p. 788].) This "careful description" is concrete and particularized, rather than abstract and general; thus, in *Washington v. Glucksberg,* a case addressing a state statute forbidding assisted suicide, the high court rejected the view the interest in question was " 'whether there is a liberty interest in determining the time and manner of one's death' " or a " 'liberty to choose how to die.' " (*Id.* at p. __ [117 S.Ct. at p. 2269, 138 L.Ed.2d at p. 789].) Instead, the high court formulated the interest more specifically as "whether the 'liberty' specially protected by the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so." (*Ibid.*) Likewise, in a case challenging the policy of the Immigration and Naturalization Service to place deportable alien juveniles in custodial child care rather than to release them to unrelated adults, the Supreme Court rejected the contention the right at issue was the " 'freedom from physical restraint,' " instead characterizing it as "the alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution." (*Reno v. Flores, supra,* 507 U.S. 292, 302 [113 S.Ct. 1439, 1447].)

Second, the court must determine whether the asserted interest, as carefully described, is one of our fundamental rights and liberties; central to this determination is whether the asserted interest finds support in our history, our traditions, and the conscience of our people. (*Washington v. Glucksberg, supra,* __ U.S. at p. __ [117 S.Ct. at p. 2268, 138 L.Ed.2d at p. 788]; *Reno v. Flores, supra,* 507 U.S. 292, 303 [113 S.Ct. 1439, 1447].)

Only if a court decides the asserted liberty interest is a fundamental interest protected by the due process clause does it weigh the state's countervailing interest, to determine whether the latter is sufficiently compelling

to justify the state's infringement of the liberty interest. "[B]y establishing a threshold requirement—that a challenged state action implicate a fundamental right—before requiring more than a reasonable relation to a legitimate state interest to justify the action, [this approach] avoids the need for complex balancing of competing interests in every case." (*Washington* v. *Glucksberg*, *supra*, __ U.S. at p. __ [117 S.Ct. at p. 2268, 138 L.Ed.2d at pp. 788-789].)

Adhering to the United States Supreme Court's methodology for analyzing substantive due process claims, our first step, therefore, is to make a "careful description" of the asserted liberty interest. (*Washington* v. *Glucksberg*, *supra*, __ U.S. at p. __ [117 S.Ct. at p. 2268, 138 L.Ed.2d at p. 788].) Carefully described, the interest for which the alleged biological father, Jerry, seeks constitutional protection is his interest in establishing a relationship with his child born to a woman married to another man at the time of the child's conception and birth.

The next step is to decide whether this interest is constitutionally protected. This question has a ready answer, for the United States Supreme Court has considered and rejected due process protection for this interest. In *Michael H.* v. *Gerald D.* (1989) 491 U.S. 110, 124-127 [109 S.Ct. 2333, 2342-2344, 105 L.Ed.2d 91], four justices, in a plurality opinion by Justice Scalia, concluded the biological father of a child born to a woman married to another man had no liberty interest in continuing his relationship with the child, notwithstanding that he had lived with the mother and child for almost a year and visited her for an additional eight months, and the child called him "Daddy." In rejecting the liberty interest claim of a man who was not only the biological father, but also had an actual personal relationship with the child, the plurality necessarily rejected as well the position that a biological connection without any actual personal relationship gives rise to a protected liberty interest.

Three dissenting justices in *Michael H.* v. *Gerald D.*, *supra*, 491 U.S. 110, concluded the actual personal relationship between the biological father and his child was a protected liberty interest. They rejected, however, the possibility that a biological father having no *existing* personal relationship with his child born to a woman married to another man could have any liberty interest in establishing a relationship with the child: "[A]lthough an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so." (*Id.* at pp. 142-143 [109 S.Ct. at p. 2352] (dis. opn. of Brennan, J., joined by Marshall, J., and Blackmun, J.).) The dissenting opinion concluded, "a mere

biological connection is insufficient to establish a liberty interest on the part of an unwed father." (*Id.* at p. 143, fn. 2 [109 S.Ct. at p. 2352].) Thus, at least seven of the nine high court justices in *Michael H.* expressly rejected the view that an unwed father's biological link to a child alone gives rise to a protected liberty interest. (See also *Lehr* v. *Robertson* (1983) 463 U.S. 248, 259-260 [103 S.Ct. 2985, 2992, 77 L.Ed.2d 614] [drawing a "clear distinction between a mere biological relationship and an *actual* relationship of parental responsibility." (Italics added.)].)

Here, Jerry has never had any personal relationship with Dawn's child, only an alleged biological link with an attempt to negotiate an agreement for child support and visitation. As explained above, in *Michael H.* v. *Gerald D., supra,* 491 U.S. 110, the United States Supreme Court decided that a biological father's mere desire to establish a personal relationship with the child is not a fundamental liberty interest protected by the due process clause. Accordingly, in this case Jerry's claim must fail.

Contrary to our conclusion, the dissent maintains Jerry does have a protected liberty interest in establishing a relationship with Dawn's child. It relies on two United States Supreme Court decisions, *Michael H.* v. *Gerald D., supra,* 491 U.S. 110 and *Lehr* v. *Robertson, supra,* 463 U.S. 248, and one of this court's adoption cases, *Kelsey S., supra,* 1 Cal.4th 816. The dissent, however, fails to acknowledge the distinction the high court in *Michael H.* v. *Gerald D., supra,* 491 U.S. 110, drew between an unwed father's interest in maintaining and preserving an *existing* parent-child relationship and the claim, rejected by at least seven justices, that an unwed father's biological connection alone to a child born to a married woman gives rise to a protected liberty interest in establishing a relationship with the child.[6]

As for *Lehr* v. *Robertson,* in that case an unwed mother, after her child's birth, married another man who then adopted the child; the unwed father

[6]Contrary to the dissent in the present case, that dissenting Justice Brennan in *Michael H.* v. *Gerald D., supra,* 491 U.S. 110, 136 [109 S.Ct. 2333, 2348-2349], would find the mother's marital status "not decisive" (*id.* at p. 144 [109 S.Ct. at p. 2353]) on the question whether the Constitution protects a biological father's interest in establishing a relationship with the child does not mean her marital status is *irrelevant,* especially where, as here, the child was born into the marital family and the alleged biological father has no actual relationship with the child. Nor, contrary to the dissent, is Justice Brennan's apparent conclusion that the *duration* of the biological parent-child relationship is irrelevant to its constitutional status (*id.* at p. 144, fn. 3 [109 S.Ct. at p. 2353]) the equivalent of a conclusion that its very *existence* is likewise irrelevant. Indeed, as we have seen, in a passage ignored by the dissent in this case, Justice Brennan found a mere biological connection insufficient to create a constitutionally protected liberty interest on the part of the biological father. (*Id.* at p. 143, fn. 2 [109 S.Ct. at p. 2352] (dis. opn. of Brennan, J.).) We do not find Justice Brennan's conclusion in this regard necessarily inconsistent with the dissent of Justice White, which Justice Brennan joined; even if it were, however, we believe Justice Brennan's opinion best reflects his own views.

claimed due process entitled him to notice and a hearing before the adoption could occur. (*Lehr* v. *Robertson, supra*, 463 U.S. 248, 250 [103 S.Ct. 2985, 2987].) Like *Kelsey S., supra*, 1 Cal.4th 816, *Lehr* v. *Robertson* concerned a child born to two unwed parents, not, as here, a child born into a marriage. Thus, the adoption cases do not support protecting as a liberty interest Jerry's desire to establish a relationship with Dawn's child born into a marriage. Moreover, the high court in *Lehr* v. *Robertson* never clearly decided to what extent the unwed father in that case had a protected liberty interest in the opportunity to develop a relationship with his child, nor was it necessary for the court to do so. Rather, after deciding that an unwed father's desire to establish a relationship with his child born to an unwed mother was not entitled to the constitutional protection accorded to existing parent-child relationships, the court concluded the state had adequately protected any constitutional interest the father may have possessed by providing a means for unwed biological fathers to register with the state and receive notification of any adoption proceedings involving their children. (*Lehr* v. *Robertson, supra*, 463 U.S. 248, 261-265 [103 S.Ct. 2985, 2993-2995].) The high court's subsequent decision in *Michael H.* v. *Gerald D., supra*, 491 U.S. 110, made clear that the biological father of a child born to a woman married to another man has no liberty interest in establishing a relationship with the child.

The dissent further suggests Jerry is potentially liable for financial support of Dawn's child, but the cases it cites in support of this startling assertion do not so hold. In *Alicia R.* v. *Timothy M.* (1994) 29 Cal.App.4th 1232, 1235-1238 [34 Cal.Rptr.2d 868], a biological father was ordered to pay support only after a judgment of nullity of the mother's marriage with a finding there were no children of the marriage, and after blood tests had established his paternity. In *County of Orange* v. *Leslie B.* (1993) 14 Cal.App.4th 976, 980-983 [17 Cal.Rptr.2d 797], the Court of Appeal declined to apply the conclusive presumption of a husband's paternity (former Evid. Code, § 621), noting: "Here there is no marital union to disrupt [by holding the biological father liable for child support]. [Wife] and [Husband's] brief marriage ended well before [the child] was born. The three never lived together as a family unit. [The child] knows [Husband] is not her father and [Husband] did not know about [the child] until he was brought into this action, 13 years later." (14 Cal.App.4th at p. 982.) The dissent cites no authority remotely similar to this case, in which the child was born into a validly existing marital family unit.[7]

---

[7]Citing *Salas* v. *Cortez* (1979) 24 Cal.3d 22, 34 [154 Cal.Rptr. 529, 593 P.2d 226] (*Salas*), Jerry argues the state has an interest in an *accurate* determination of biological paternity. He takes that decision out of context. In *Salas* we concluded procedural due process requires the

CONCLUSION

Because Jerry cannot establish a constitutionally protected liberty interest in being allowed to form a parental relationship with Dawn's child, application to this case of sections 7611 and 7630 does not deprive him of due process. The judgment of the Court of Appeal therefore is reversed, and the cause is remanded to that court with directions to issue a writ of mandate directing respondent Superior Court of Riverside County to vacate its order denying Dawn's motion for judgment on the pleadings and to enter a new order granting the motion.

George, C. J., Kennard, J., Baxter, J., and Brown, J., concurred.

**KENNARD, J.,** Concurring.—The due process clause of the Fourteenth Amendment to the federal Constitution, in its "substantive" aspect, protects fundamental liberties from state interference absent a compelling reason for the state's action. At issue in this case is whether a biological father's desire to establish a relationship with his child born to a woman married to another man is a constitutionally protected fundamental liberty interest. I concur fully in the majority's conclusion that, in the absence of any existing personal relationship with the child, a biological father lacks any constitutionally protected liberty interest. I write separately to note that there are additional grounds also supporting that conclusion.

I

This case involves Dawn, Dawn's child conceived and born during her marriage to her husband Frank, and Jerry, who alleges he is the biological father of Dawn's child. Dawn and Frank have had exclusive custody of the child since birth, and Jerry has established no personal relationship with the child. Before birth, Jerry brought suit alleging that he is the biological father of Dawn's child and seeking custody and visitation. As the majority explains, California law presumes that, because the child was born during Dawn's marriage to Frank, Frank is the father of Dawn's child, and it precludes Jerry from bringing any legal action to challenge that presumption. (Fam. Code, §§ 7611, subd. (a), 7630, subd. (a).) Jerry contends nonetheless that he has a liberty interest protected by the due process clause of the United States Constitution in establishing a parental relationship with

---

appointment of counsel for indigent defendants in paternity actions prosecuted by the state, balancing the state's largely financial interest in denying counsel against the profound emotional, financial and legal implications of an erroneous paternity judgment. (*Id.* at pp. 29-34.) *Salas* did not address the situation in the present case, where a man is actively seeking to establish his paternity of a child born to a married woman whose husband is statutorily presumed to be the child's father and is fulfilling that role. (See § 7611, subds. (a), (d).)

Dawn's child. The trial court held that if Jerry was the biological father of Dawn's child he had a substantive due process right to establish a relationship with the child, and on that basis ordered blood testing to determine whether Jerry was the biological father of Dawn's child. The Court of Appeal denied without comment Dawn's petition for a writ of mandate seeking to overturn the trial court's ruling.

## II

As the majority opinion explains, in *Michael H.* v. *Gerald D.* (1989) 491 U.S. 110, 124-127 [109 S.Ct. 2333, 2342-2344, 105 L.Ed.2d 91], seven justices of the United States Supreme Court concluded that, in the absence of any existing personal relationship with the child, a biological father's desire to establish a relationship with his child born to a woman married to another man is not a fundamental liberty interest protected by the due process clause of the Fourteenth Amendment to the federal Constitution. But, even if the high court had not decided the question in *Michael H.* v. *Gerald D.* and we were free to consider the matter independently, I would still reach this same conclusion.

As the majority notes, in deciding whether an asserted interest is one of our fundamental rights and liberties substantively protected by the due process clause, a court must examine whether the interest, " 'careful[ly] descri[bed],' " finds support in our history, our traditions, and the conscience of our people. (*Washington* v. *Glucksberg* (1997) __ U.S. __, __ [117 S.Ct. 2258, 2268, 138 L.Ed.2d 772]; accord, *Reno* v. *Flores* (1993) 507 U.S. 292, 303 [113 S.Ct. 1439, 1447-1448, 123 L.Ed.2d 1].) Here, there is no support in history or our legal tradition for Jerry's claim that a biological father without any actual personal relationship with his child born to a woman married to another man has a fundamental right to establish a relationship with the child. Indeed, history and tradition are directly to the contrary, for society has consistently *denied* to the biological father in these circumstances any opportunity to establish paternal rights over the child of another man's wife. For centuries, there has existed the presumption of legitimacy: the legal presumption that a child born during wedlock is the husband's issue (absent proof of the husband's impotence). (10 Am.Jur.2d (1963) Bastards, § 11, p. 851 ["The principle that children born in wedlock are presumed to be legitimate is universally recognized."].) Lord Coke stated the common law rule: "By the common law if the husband be within the foure seas, that is within the jurisdiction of the king of England, if the wife hath issue, no proofe is to be admitted to prove the child a bastard, . . . unless the

husband hath an apparent impossibilitie of procreation."[1] (Coke on Littleton, Institutes of the Laws of England (1628) 244a [bk. 3, ch. 6, § 399].)

Like other jurisdictions, California has long recognized the presumption of legitimacy. In 1872, our Legislature codified the presumption as follows: If the husband and wife were cohabiting at the time of conception and the husband was not impotent, the presumption that the husband was the father was indisputable. (Code Civ. Proc., former § 1962, subd. 5, enacted 1872, amended by Stats. 1955, ch. 948, § 3, p. 1835, repealed by Stats. 1965, ch. 299, § 110, p. 1363, eff. Jan. 1, 1967 ["the issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate"]; *Estate of Mills, supra,* 137 Cal. 298, 301-304.) A similar provision continues in our current Family Code. (Fam. Code, § 7540.) If the parents were married but not cohabiting at the time of conception, the presumption could be disproven, but only by a member of a narrow class of persons. (Civ. Code, former §§ 193, 195, superseded by Evid. Code, former § 661, enacted by Stats. 1965, ch. 299, § 2, p. 1310, repealed by Stats. 1975, ch. 1244, § 14, p. 3202; accord, Fam. Code, §§ 7611, subd. (a), 7630, subd. (a).) Most important, the group of persons with standing to disprove the presumption has always been limited to designated members of the marital family and their descendants, and an alleged biological father has never been permitted to challenge the paternity of a child born into the marriage of a woman and another man. (Civ. Code, former §§ 193, 195 [permitting challenges only by the husband, wife, or their descendants]; Fam. Code, §§ 7611, subd. (a), 7630, subd. (a) [permitting challenges only by the husband, wife, or child]; see also *In re Madalina* (1917) 174 Cal. 693, 696 [164 P. 348, 1 A.L.R. 1629] [describing this refusal to permit outsiders to challenge the presumption of legitimacy as the "rule prevailing generally in all civilized communities"]; *Michael H.* v. *Gerald D., supra,* 491 U.S. 110, 124-126 [109 S.Ct. 2333, 2342-2343] (plurality opn. of Scalia, J. [discussing history of the presumption of legitimacy]).)

Nor is there an inconsistency between *Michael H.* v. *Gerald D., supra,* 491 U.S. 110, and our court's decisions prohibiting an unwed mother from unilaterally consenting to an adoption over the objections of an unwed father who has come forward to assume parental responsibility. (*Adoption of Michael H.* (1995) 10 Cal.4th 1043 [43 Cal.Rptr.2d 445, 898 P.2d 891]; *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d

---

[1]As this court noted long ago, Shakespeare also restated this presumption: "King John: Sirrah, your brother is legitimate; Your father's wife did after wedlock bear him; And, if she did play false, the fault was hers; Which fault lies on the hazards of all husbands That marry wives." (Shakespeare, King John, act I, scene 1, quoted in *Estate of Mills* (1902) 137 Cal. 298, 301 [70 P. 91].)

1216].) When carefully described, the interest for which Jerry seeks constitutional protection differs from the interest at issue in our adoption cases. In those cases, the child was not born to a mother who was the wife in an intact marital family, but to two unwed parents, one of whom (the mother) wished to terminate her parent-child relationship. The interest at issue thus was the interest of an unwed father in establishing a relationship with his child born to an unwed mother who was terminating her parent-child relationship. Due process protection for this interest does not dictate that Jerry's different interest is likewise protected by due process.

The common law likewise differentiated between fathers of children born to unwed mothers and fathers of children born into the marriage of a woman and another man. At common law, the unwed mother of a child had the right to custody of the child to the exclusion of the biological father. (*Ex Parte Knee* (1804) 127 Eng.Rep. 416; *Rex* v. *Soper* (1793) 101 Eng.Rep. 156; 10 Am.Jur.2d, *supra*, Bastards, §§ 60-61, pp. 889-890; Annot., Right of mother to custody of illegitimate child (1927) 51 A.L.R. 1507, 1512; accord, Civ. Code, former § 200, repealed by Stats. 1975, ch. 1244, § 4, p. 3195; *Guardianship of Smith* (1954) 42 Cal.2d 91, 93 [265 P.2d 888, 37 A.L.R.2d 867].) If, however, the unwed mother died, abandoned or neglected the child, or gave the child up for adoption, the biological father had a right to custody of the child. (10 Am.Jur.2d, *supra*, Bastards, §§ 61-62, pp. 890-891; accord, *Guardianship of Smith, supra*, at p. 93.) Our adoption cases, in permitting a biological father an opportunity to establish a relationship with his child by an unwed mother who was giving the child up for adoption, have not ventured beyond the common law rule; if that same rule were applied to decide in this case whether Jerry's interest was a protected liberty interest, it would not assist him because Dawn, the child's mother, has not given the child up for adoption or otherwise declined her parental responsibilities.

### CONCLUSION

A man who wishes to father a child and ensure his relationship with that child can do so by finding a partner, entering into a marriage, and undertaking the responsibilities marriage imposes. One who instead fathers a child with a woman married to another man takes the risk that the child will be raised within that marriage and that he will be excluded from participation in the child's life. The due process clause of the United States Constitution provides no insurance against that risk and is not an instrument for disrupting the marital family in order to satisfy the biological father's unilateral desire, however strong, to turn his genetic connection into a personal relationship.

Baxter, J., and Brown, J., concurred.

**CHIN, J.**—I dissent.

The governing decisions of both the United States Supreme Court and this court establish that a biological father who promptly comes forward to assume his paternal responsibilities has a constitutional liberty interest in the *opportunity* to develop a relationship with his child, which the state may not extinguish without due process of law. The *existence* of this interest does not depend on the marital status of the child's mother. The trial court in this case found that Jerry K., who alleges that he is the biological father of Dawn D.'s son, had done all he could under the circumstances to demonstrate a full commitment to his parental responsibilities, and the majority does not contest this finding. Thus, assuming he is the child's biological father, Jerry has a protected constitutional liberty interest in the opportunity to develop a relationship with his son, which the state may not extinguish without due process of law.

In order to determine what process is due, we must balance Jerry's interest against the state's interests. Dawn cites state interests in protecting the child's welfare and in preserving the stability of the marital family. These interests are, of course, both legitimate and substantial. However, on the facts of this case, they do not justify the state's categorical presumption that Jerry's exclusion from the child's life is warranted nor its refusal to afford Jerry a hearing on the matter.

In reaching this conclusion, I do not suggest what the outcome of a hearing should be. A court might very well find that, under the circumstances, Jerry should have no contact with the child, even if he is the biological father. Moreover, the state may constitutionally enact a rebuttable presumption that this outcome serves the child's best interests and may establish hearing procedures to protect the stability of the marital family. However, as a matter of due process, the state may *not* constitutionally deprive Jerry of *all* opportunity to be heard. Therefore, I cannot join the majority.

## I. FACTUAL AND PROCEDURAL BACKGROUND

According to the trial court findings, Dawn and Frank married in June 1989. In early January 1995, Dawn left Frank and began living with Jerry. In February 1995, Dawn became pregnant. Two months later, in April, she moved out of Jerry's home and moved back in with Frank. In November 1995, Dawn gave birth to a son.

In August 1995, before the child's birth, Jerry filed a complaint to establish a parental relationship. The complaint requested joint legal custody, with physical custody awarded to Dawn subject to Jerry's right of reasonable visitation.

Dawn answered the complaint in September 1995, asking the court to deny relief. She subsequently moved for judgment on the pleadings, arguing that Jerry could not maintain a paternity action because Frank was the child's presumed father under Family Code section 7611.[1] Dawn asserted that Frank was a presumed father under this statute because the child was born during their marriage and Frank received the child into his home and openly held the child out as his own. She also asserted that Jerry lacked standing to request a blood test to establish biological paternity.

Jerry opposed the motion and submitted supporting evidence. According to his declaration, he began a sexual relationship with Dawn in December 1994, and she moved in with him in January 1995. She amended her voter registration to reflect Jerry's address and had the post office change her mailing address to Jerry's. Dawn told Jerry that she would marry him as soon as she legally could and that she wanted to start a family. At Dawn's request, Jerry submitted to fertility testing. Jerry also began building an addition to his home in anticipation of having a child with Dawn. After Dawn became pregnant, she told people that the baby was Jerry's, and that she and Jerry intended to marry. Jerry also submitted declarations from friends corroborating some of the statements in his declaration, including his assertion that Dawn said she wanted to marry Jerry and have children with him.

Dawn submitted reply declarations contesting some of Jerry's assertions. For example, she denied telling Jerry that she would marry him as soon as she could. She also denied ever having an intent to change her domicile to Jerry's residence. According to Dawn and Frank, they continued to have contact with each other while she lived with Jerry.

After argument, the trial court denied Dawn's motion. Applying the relevant authorities, it first found that, if Jerry was the biological father, then he had a constitutionally protected interest in having an opportunity to develop a relationship with the child. In reaching this conclusion, the court stated: "It is hard to imagine what else [Jerry] could have done under these circumstances to 'preserve his interest' . . . and to prove that he has 'promptly come forward and demonstrated a full commitment to his parental responsibilities.' [Jerry] filed the within action to determine parentage prior to the birth of the child. Once he learned that the child was born, he began negotiations with [Dawn] for blood testing, payment of child support and visitation. It would appear from correspondence between counsel that an agreement had been reached for visitation and payment of child support. It also appears that [Jerry] took a parenting class . . . in preparation for the

---

[1] All further statutory references are to the Family Code.

birth of the child and his anticipated parental duties." The court then balanced Jerry's interest against the state's interest in the child's welfare and family stability. It concluded that, under the circumstances, Jerry should have an opportunity to establish he is the child's biological father.

The Court of Appeal summarily denied Dawn's petition for writ of mandate. We then granted Dawn's petition for review.

## II. DISCUSSION

### A. *Jerry Has a Constitutionally Protected Interest*

Constitutional due process protections "apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." (*Board of Regents* v. *Roth* (1972) 408 U.S. 564, 569 [92 S.Ct. 2701, 2705, 33 L.Ed.2d 548] (*Roth*).) Accordingly, the first step in analyzing a due process claim is to determine whether "the interest is within the Fourteenth Amendment's protection of liberty and property." (*Id.* at p. 571 [92 S.Ct. at p. 2706].) We must "begin the inquiry with a determination of the precise nature of the private interest that is threatened by the State. [Citation.] Only after that interest has been identified, can we properly evaluate the adequacy of the State's process. [Citation.]" (*Lehr* v. *Robertson* (1983) 463 U.S. 248, 256 [103 S.Ct. 2985, 2990, 77 L.Ed.2d 614] (*Lehr*).) Thus, "we are faced with . . . a familiar two-part inquiry: we must determine whether [Jerry] was deprived of a protected interest, and, if so, what process was his due." (*Logan* v. *Zimmerman Brush Co.* (1982) 455 U.S. 422, 428 [102 S.Ct. 1148, 1154, 71 L.Ed.2d 265].)

Regarding the first issue, applying the decisions of the United States Supreme Court and this court, I conclude Jerry has a constitutional liberty interest in the opportunity to develop a relationship with Dawn's child, assuming he is the child's biological father. The high court has addressed the constitutional rights of unwed fathers several times. In *Michael H.* v. *Gerald D.* (1989) 491 U.S. 110 [109 S.Ct. 2333, 105 L.Ed.2d 91] (*Michael H.*), the high court considered the constitutionality of a California statute providing that " 'the issue of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage.' " (*Id.* at p. 117 [109 S.Ct. at p. 2339] (plur. opn. of Scalia, J.).) In *Michael H.*, during the first year of the child's life, she and her mother lived with the alleged natural father for two to three months, and he held her out as his child. The mother, with the child, then left the alleged natural father and rebuffed his further visitation attempts. He then filed a filiation action to establish paternity and visitation rights. Nine months later, the mother again became

involved with the alleged natural father. For the next eight months, when he was in town, he lived with the mother and her child and held the child out as his daughter. The mother then left the alleged natural father and reconciled with her husband. The alleged natural father and the child then sought visitation rights. (*Michael H., supra,* 491 U.S. at pp. 113-115 [109 S.Ct. at pp. 2337-2339] (plur. opn. of Scalia, J.).)

There was no majority opinion in *Michael H.* Justice Scalia, writing for the plurality, found that the alleged natural father had no "constitutionally protected right" under the circumstances. (*Michael H., supra,* 491 U.S. at p. 129, fn. 7 [109 S.Ct. at p. 2345] (plur. opn. of Scalia, J.).) However, Justice Stevens, who provided the fifth vote to uphold the statutory scheme, expressly refused to endorse this conclusion. Although concurring in the judgment, he disagreed with the plurality's rejection of "the possibility that a natural father might ever have a constitutionally protected interest in his relationship with a child whose mother was married to, and cohabiting with, another man at the time of the child's conception and birth." (*Id.* at p. 133 [109 S.Ct. at p. 2347] (conc. opn. of Stevens, J.).) Indeed, he was "willing to assume for the purpose of deciding [the] case that [the alleged natural father's] relationship with [the child] [was] strong enough to give him a constitutional right to try to convince a trial judge that [the child's] best interest would be served by granting him visitation rights." (*Ibid.*) However, Justice Stevens found the statutory scheme "consistent with the Due Process Clause" because he was "convinced that the trial judge had the authority under state law both to hear [the alleged natural father's] plea for visitation rights and to grant him such rights if [the child's] best interests so warranted . . . ." (*Id.* at p. 136 [109 S.Ct. at p. 2349] (conc. opn. of Stevens, J.).)

Justices White and Brennan filed separate dissents. In his dissent, Justice White, joined by Justice Brennan, found that the alleged natural father had "a liberty interest that cannot be denied without due process of the law . . . ." (*Michael H., supra,* 491 U.S. at p. 157 [109 S.Ct. at p. 2360] (dis. opn. of White, J.).) Justice White cited the court's prior cases recognizing the liberty interest of a natural father in his relationship with his child, noting that none of those cases indicated "that the father's rights were dependent on the marital status of the mother or biological father." (*Ibid.*) The "basic principle" is that "an unwed father who has demonstrated a sufficient commitment to his paternity by way of personal, financial, or custodial responsibilities has a protected liberty interest in a relationship with his child." (*Id.* at pp. 157-158 [109 S.Ct. at p. 2360], fn. omitted (dis. opn. of White, J.).) Justice White stressed that the natural father "ha[d] asserted his interests in raising and providing for his child since the very time of the child's birth." (*Id.* at p. 159 [109 S.Ct. at p. 2361] (dis. opn. of White, J.).)

He also noted a previous high court decision suggesting that states "must provide a biological father of an illegitimate child the means by which he may establish his paternity so that he may have the opportunity to develop a relationship with his child." (*Ibid.*) Quoting *Lehr, supra,* 463 U.S. at page 261 [103 S.Ct. at page 2993], Justice White explained: " 'When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child" [citation], his interest in personal contact with his child acquires substantial protection under the Due Process Clause.' [Citation.]" (*Michael H., supra,* 491 U.S. at p. 160 [109 S.Ct. at p. 2361] (dis. opn. of White, J.).)

Justice Brennan, in a dissent joined by Justices Marshall and Blackmun, also found that the alleged natural father had a constitutional "liberty interest in his relationship" with the child. (*Michael H., supra,* 491 U.S. at p. 136 [109 S.Ct. at p. 2349] (dis. opn. of Brennan, J.).) Like Justice White, Justice Brennan explained that "marriage is not decisive in answering the question whether the Constitution protects the parental relationship under consideration." (*Id.* at p. 144 [109 S.Ct. at p. 2353] (dis. opn. of Brennan, J.).) Also like Justice White, Justice Brennan quoted *Lehr, supra,* 463 U.S. at page 261 [103 S.Ct. at page 2993], in declaring that the interest of an unwed father in personal contact with his child acquires substantial protection when he " 'demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child . . . ." ' " (*Michael H., supra,* 491 U.S. at p. 143 [109 S.Ct. at p. 2352] (dis. opn. of Brennan, J.).) Summarizing the "common ground shared by a majority of" the high court, Justice Brennan explained: "Five Members of the Court refuse to foreclose 'the possibility that a natural father might ever have a constitutionally protected interest in his relationship with a child whose mother was married to, and cohabiting with, another man at the time of the child's conception and birth.' [Citations.] Five Justices agree that the flaw inhering in a conclusive presumption that terminates a constitutionally protected interest without any hearing whatsoever is a *procedural* one. [Citations.] Four Members of the Court agree that [the alleged natural father] has a liberty interest in his relationship with [the child] [citations], and one assumes for purposes of this case that he does [citation]." (*Michael H., supra,* 491 U.S. at p. 136 [109 S.Ct. at p. 2349], original italics (dis. opn. of Brennan, J.).)

*Lehr,* the decision that both Justices Brennan and White quoted in their *Michael H.* dissents, is perhaps even more instructive on the issue before us. There, an alleged natural father sought to overturn an order of a New York state court granting a petition for adoption of a child by the mother's husband. The mother had married her husband eight months after the child's

birth. (*Lehr, supra,* 463 U.S. at p. 250 [103 S.Ct. at p. 2987].) The adoption petition was filed when the child was two years old. (*Ibid.*) During the child's lifetime, the alleged natural father never lived with the mother and child or provided them with financial support. (*Id.* at p. 252 [103 S.Ct. at p. 2988].) The alleged natural father was not sent notice of the adoption proceeding and learned of it only four days before a court granted the adoption petition. (*Id.* at pp. 252-253 [103 S.Ct. at p. 2989].) In seeking to overturn the adoption order, he argued that the state had impermissibly extinguished his constitutional liberty interest in the potential relationship with his child without due process of law. (*Id.* at p. 255 [103 S.Ct. at p. 2990].)

Although the high court affirmed the adoption order, its reasoning indicates that the alleged natural father had a constitutional liberty interest that entitled him to due process, despite his initial lack of effort to have contact with the child. In the first part of its opinion, the court "consider[ed] the nature of the interest in liberty for which [the alleged natural father] claims constitutional protection . . . ." (*Lehr, supra,* 463 U.S. at p. 256 [103 S.Ct. at p. 2990].) The court explained: "The intangible fibers that connect parent and child . . . are sufficiently vital to merit constitutional protection in appropriate cases." (*Ibid.*) The court further explained: "The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie." (*Id.* at p. 262 [103 S.Ct. at pp. 2993-2994], fn. omitted.) The court noted that the alleged natural father had "never had any significant custodial, personal, or financial relationship with [the child], and he did not seek to establish a legal tie until after she was two years old." (*Ibid.,* fn. omitted.) Despite this lack of effort, the court stated that it had to determine whether New York's statutes "adequately protected [the alleged natural father's] *opportunity* to form such a relationship." (*Id.* at p. 263 [103 S.Ct. at p. 2994], italics added.)

The court then considered, and found constitutionally adequate, the procedures New York afforded natural fathers. Under the statutory scheme, any man who filed with the state's "putative father registry" or who fell within certain listed classes of possible unwed fathers was entitled to notice of any adoption proceeding and an opportunity to present evidence regarding the child's best interests. (*Lehr, supra,* 463 U.S. at pp. 251-252 & fn. 5 [103 S.Ct. at p. 2988].) According to the high court, "[i]f this scheme were likely

to omit many responsible fathers, and if qualification for notice were beyond the control of an interested putative father, it might be thought procedurally inadequate." (*Id.* at pp. 263-264 [103 S.Ct. at pp. 2994-29994-2995].) However, the statutory scheme "adequately protected" the alleged natural father's "opportunity to establish a relationship with" his child because "the right to receive notice was completely within [his] control. By mailing a postcard to the putative father registry, he could have guaranteed that he would receive notice of any [adoption] proceedings . . . ." (*Id.* at p. 264 [103 S.Ct. at p. 2995].)

As this discussion demonstrates, the high court in *Lehr* concluded that the alleged natural father had a constitutional liberty interest in the *opportunity to develop* a relationship with his child, even though he had made *no effort* to establish or cultivate a relationship with her during the first two years of her life. This conclusion is apparent both from the language of the court's opinion, which I have set forth above, and from the very fact that the court proceeded to the second part of the due process analysis, determining the constitutional adequacy of the state procedures. Had it found that the alleged natural father had no constitutional liberty interest, the court would not have moved on to this second step.

In *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*), we reached precisely this interpretation of *Lehr*. There, we considered the constitutional rights of Rickie M., a biological father who did not achieve the status of a presumed father under California law in part because the child's mother, a court order, and prospective adoptive parents thwarted his attempts to receive the child into his home. (*Kelsey S., supra,* 1 Cal.4th at p. 825.) More specifically, we had to determine the constitutionality of a statutory scheme *that permitted adoption of Rickie's biological child by third parties without Rickie's consent.* (*Id.* at pp. 824-825.) Applying the recognized analysis for due process claims, we first addressed the nature of Rickie's asserted interest, "guided" by the high court's decisions "dealing with the rights of unwed fathers." (*Id.* at p. 830.) After observing that the high court in *Lehr* "recognized the uniqueness of the biological connection between parent and child," we concluded: "*Lehr* can·fairly be read to mean that a father need only make a reasonable and meaningful attempt to establish a relationship [with his natural child], not that he must be successful against all obstacles."[2] (*Kelsey S., supra,* 1 Cal.4th at p. 837.) Describing *Michael H.*, we stated: "[I]t is clear that even in the extreme

---

[2]The majority asserts that the high court in *Lehr, supra,* 463 U.S. 248, "never clearly decided to what extent the unwed father in that case had a protected liberty interest in the opportunity to develop a relationship with his child . . . ." (Maj. opn., *ante,* at p. 943.) As I have demonstrated, and as we explained in *Kelsey S., supra,* 1 Cal.4th 816, the high court in

circumstances of that case—the mother being married to and living with her husband, who was not the child's biological father—a majority of the justices were solicitous of the rights of unwed biological fathers. For them, the *determinative factor* was whether a biological father has *attempted* to establish a relationship with his child." (*Kelsey S., supra,* 1 Cal.4th at p. 837, italics added.) More generally, we extracted from the high court decisions "one unifying and transcendent theme . . . . The biological connection between father and child is unique and worthy of constitutional protection if the father grasps the opportunity to develop that biological connection into a full and enduring relationship." (*Id.* at p. 838.) Ultimately, we concluded that "a biological father has a constitutionally cognizable opportunity interest in developing a relationship with his child." (*Id.* at p. 844.) "If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Id.* at p. 849.)

Under these decisions, if Jerry is the child's biological father, then he has a constitutional liberty interest in the opportunity to develop a relationship with his child. As I have previously noted, the trial court found "[i]t . . . hard to imagine what else [Jerry] could have done under these circumstances to 'preserve his interest' . . . and to prove that he has 'promptly come forward and demonstrated a full commitment to his parental responsibilities.' " The majority does not challenge this finding, and independently finds that Jerry went to "considerable efforts to assert parental rights." (Maj. opn., *ante,* at p. 937.) Thus, Jerry has done significantly more to assume his paternal responsibilities than did the alleged natural father in *Lehr*. If the alleged natural father in *Lehr*, who made no effort to establish a relationship with his child during the first two years of her life, had a constitutionally protected liberty interest in the opportunity to develop a relationship with his child—and the United States Supreme Court held that he did—then surely Jerry, who has been trying since before the birth of Dawn's child to assume parental responsibilities, has an interest at least as great, assuming he is the natural father. Therefore, the interest Jerry asserts in this case is part of the liberty that the due process clause protects.

B. *The Majority Ignores Kelsey S. and Misinterprets the Separate Opinions in Michael H.*

In concluding that Jerry has no constitutional liberty interest on the facts of this case, the majority relies exclusively on the high court's decision in

---

*Lehr* clearly did decide that the natural father had *some* constitutionally protected opportunity interest, even if it did not explain the full "extent" of that right.

*Michael H., supra,* 491 U.S. 110. The majority asserts that at least seven justices there considered and rejected due process protection for the interest that Jerry asserts. (Maj. opn., *ante,* at p. 942.) It maintains that my analysis "fails to acknowledge the distinction the high court in *Michael H.* . . . drew between an unwed father's interest in maintaining and preserving an *existing* parent-child relationship and the [rejected] claim . . . that an unwed father's biological connection alone to a child born to a married woman gives rise to a protected liberty interest in establishing a relationship with the child." (Maj. opn., *ante,* at p. 942, original italics.) For several reasons, the majority errs.

First, the majority has mischaracterized my position. I would not, as the majority suggests, hold that "an unwed father's biological connection *alone* to a child born to a married woman gives rise to a protected liberty interest in establishing a relationship with the child." (Maj. opn., *ante,* at p. 942, italics added; see also *id.* at fn. 6.) Rather, as *both* Justice Brennan and Justice White wrote in *Michael H.,* I would hold that " '[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," . . . his interest in personal contact with his child acquires substantial protection under the Due Process Clause.' " (*Michael H., supra,* 491 U.S. at p. 143 [109 S.Ct. at p. 2361] (dis. opn. of Brennan, J.); *id.* at p. 160 [109 S.Ct. at p. 2352] (dis. opn. of White, J.).)

Second, the majority is incorrect in asserting that a majority of the high court in *Michael H.* held that a natural father has a liberty interest *only* where he successfully establishes a substantial relationship with his child. In fact, *none* of the justices in *Michael H.* adopted that position. To begin with, Justice Scalia's plurality opinion in *Michael H.* expressly rejected the very distinction the majority now purports to draw, i.e., that creation of a natural father's liberty interest depends on the existence of "an established parental relationship." (*Michael H., supra,* 491 U.S. at p. 123 [109 S.Ct. at p. 2342].)

Moreover, the majority errs in reading Justice Brennan's *Michael H.* dissent as concluding that a liberty interest arises *only* if the natural father successfully establishes an "*existing* personal relationship" with his child. (Maj. opn., *ante,* at p. 941, original italics.) In so reading that dissent, the majority ignores the statement from Justice Brennan's opinion that I have quoted above, which focuses on whether the natural father " 'demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child" . . . .' " (*Michael H., supra,* 491 U.S. at p. 143 [109 S.Ct. at p. 2352] (dis. opn. of Brennan, J.).) Furthermore,

in relying exclusively on another statement in Justice Brennan's dissent, the majority fails to appreciate the factual context of the *Michael H.* case. As the majority notes (maj. opn., *ante*, at p. 941), Justice Brennan observed in *Michael H.* that a liberty interest arises when a biological link is "combined with a substantial parent-child relationship." (*Michael H., supra*, 491 U.S. at p. 142 [109 S.Ct. at p. 2352] (dis. opn. of Brennan, J.).) However, this statement, unlike the broader statement that I have quoted above, simply reflected the facts of the case, which were that the natural father had established a relationship with his child. Thus, contrary to the majority's assertion, nothing in Justice Brennan's dissent even suggests, let alone "expressly" holds (maj. opn., *ante*, at p. 942), that a natural father's constitutional liberty interest arises *only* where he successfully establishes a relationship with his child.

On the contrary, to the extent Justice Brennan, and those who joined his dissent, expressed an opinion in *Michael H.* regarding the constitutional rights of a natural father in circumstances specifically like Jerry's, their views are consistent with, not contrary to, mine. In finding that the natural father in *Michael H.* had a constitutional liberty interest, Justice Brennan emphasized that the natural father "ha[d] from the beginning sought to strengthen and maintain his relationship with" his child. (*Michael H., supra*, 491 U.S. at p. 143 [109 S.Ct. at p. 2352] (dis. opn. of Brennan, J.).) Although he also noted at one point that the natural father had "lived with [the child] as her father" (*ibid.*), later in his opinion Justice Brennan rejected the plurality's suggestion "that the length of time that [the natural father] and [the child] lived together is relevant to the question whether they have a liberty interest in their relationship with each other." (*Id.* at p. 144, fn. 3 [109 S.Ct. at p. 2353] (dis. opn. of Brennan, J.).) Justice Brennan's determination that this factor is irrelevant is inconsistent with the majority's conclusion that Justice Brennan would have recognized a constitutional liberty interest *only* where a substantial parent-child relationship has been established. On the other hand, it is *consistent* with my conclusion and the conclusion we reached in *Kelsey S., supra*, 1 Cal.4th 816, that, under the high court cases, a constitutional liberty interest exists where the biological father promptly comes forward to participate in child rearing.

The third, and perhaps most compelling, reason that I disagree with the majority is that its conclusion and its interpretation of *Michael H., supra*, 491 U.S. 110, are directly contrary to our decision in *Kelsey S.* As I have explained, in *Kelsey S.*, we held that "a biological father has a constitutionally cognizable *opportunity* interest *in developing* a relationship with his child." (*Kelsey S., supra*, 1 Cal.4th at p. 844, italics added.) Thus, "[i]f an

unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities . . . his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Id.* at p. 849.) In reaching this conclusion, we interpreted *Lehr, supra,* 463 U.S. 248, as holding "that a father need only make a reasonable and meaningful attempt to establish a relationship, not that he must be successful against all obstacles." (*Kelsey S., supra,* 1 Cal.4th at p. 837.) We also observed that, for a majority of the high court in *Michael H.,* "the determinative factor" was *not* whether a substantial relationship exists, but "whether a biological father has *attempted* to establish a relationship with his child." (*Kelsey S., supra,* 1 Cal.4th at p. 837, italics added.) Thus, in *Kelsey S.,* we expressly rejected both the majority's analysis and its current interpretation of the separate opinions in *Michael H.*

The majority does not acknowledge this obvious inconsistency. Instead, it virtually ignores *Kelsey S.,* summarily noting that it was an "adoption case[]" that "concerned a child born to two unwed parents, not, as here, a child born into a marriage." (Maj. opn., *ante,* at p. 943.) Thus, the majority's refusal to follow *Kelsey S.* in this case turns *solely* on the marital status of the child's mother, Dawn.

The most obvious flaw in the majority's position is its failure to explain why the fact that *Kelsey S.* involved adoption and this one does not warrants ignoring our reading in *Kelsey S.* of *Michael H., supra,* 491 U.S. 110. As I have just noted, in *Kelsey S.,* we concluded that "the determinative factor" for "a majority of the justices" in *Michael H.* was not whether a substantial relationship exists, but "whether a biological father has *attempted* to establish a relationship with his child." (*Kelsey S., supra,* 1 Cal.4th at p. 837, italics added.) That *Kelsey S.* was an adoption case has no bearing on this conclusion. Thus, even were I to agree with the majority that Dawn's marital status is relevant to the existence of Jerry's constitutional right, unlike the majority, I would not feel free to ignore our pronouncements in *Kelsey S.* regarding the majority view in *Michael H.,* which, of course, was not an adoption case but was a case similar to the one before us.

In any event, I cannot adopt the majority's implicit conclusion that the existence of a natural father's constitutional right turns on the marital status of the mother. Nothing in our analysis in *Kelsey S.* supports drawing a distinction on this basis. On the contrary, in determining there the constitutional rights of a natural father, we relied on *all* of the high court cases addressing this question, whether they involved a single mother (e.g., *Lehr, supra,* 463 U.S. 248) or a married one (e.g., *Michael H., supra,* 491 U.S.

110). (*Kelsey S.*, *supra*, 1 Cal.4th at pp. 830-839.) Thus, nothing in *Kelsey S.* supports the majority's attempt to limit the relevance of that decision to the adoption context.

Moreover, the majority's focus on the mother's marital status is inconsistent with the majority view in *Michael H.* There, Justice White flatly declared that, under the high court cases, a natural father's rights are not "dependent on the marital status of the mother or biological father." (*Michael H.*, *supra*, 491 U.S. at p. 157 [109 S.Ct. at p. 2360] (dis. opn. of White, J.).) Similarly, Justice Brennan, also writing for Justices Marshall and Blackmun, explained that "marriage is not decisive in answering the question whether the Constitution protects the parental relationship under consideration." (*Id.* at p. 144 [109 S.Ct. at p. 2353] (dis. opn. of Brennan, J.).) Justice Stevens "d[id] not agree" with the plurality's view that a natural father could never "have a constitutionally protected interest in his relationship with a child whose mother was married to, and cohabiting with, another man at the time of the child's conception and birth." (*Id.* at p. 133 [109 S.Ct. at p. 2347] (conc. opn. of Stevens, J.).) In disagreeing with this position, Justice Stevens implicitly rejected the majority's view that, simply because a mother is married, a natural father does not have a constitutional liberty interest in a relationship with his child. Thus, a majority of the high court in *Michael H.* declined to make the existence of a natural father's constitutional right depend on the very factor the majority now cites in refusing to follow *Kelsey S.*, *supra*, 1 Cal.4th 816.

Furthermore, inherent in the majority's conclusion that the mother's marital status is determinative of the natural father's constitutional rights is a balancing of interests that should be irrelevant to determining the *existence* of a constitutional right. To hold, as does the majority, that the existence of Jerry's constitutional right depends on Dawn's marital status is "to say that whether [Jerry] . . . ha[s] a liberty interest varies with the State's interest in recognizing that interest, for it is the State's interest in protecting the marital family—and not [Jerry] and [the child's] interest in their [potential] relationship with each other—that varies with the status of [Dawn] and [Frank's] relationship." (*Michael H.*, *supra*, 491 U.S. at p. 146 [109 S.Ct. at p. 2354] (dis. opn. of Brennan, J.).) However, under the "established framework" for analyzing due process claims, we should not "consider the State's interest in limiting the extent of the procedures that will attend the deprivation of [a constitutional] interest" until *after* we determine that "the person claiming constitutional protection has an interest that the Constitution recognizes . . . ." (*Michael H.*, *supra*, 491 U.S. at p. 145 [109 S.Ct. at p. 2354] (dis. opn. of Brennan, J.); see also *Roth*, *supra*, 408 U.S. at pp. 570-571 [92 S.Ct.

at pp. 2705-2706] ["weighing process" is "part of any determination of the *form* of hearing" required, but "to determine whether due process require-ments apply in the first place, we must look not to the 'weight' but to the *nature* of the interest at stake"].) Accordingly, in concluding that Jerry has no constitutional right, the majority necessarily, and improperly, has bal-anced his interests against the state's countervailing interests.

As Justice Brennan explained in *Michael H.*, the majority's emphasis on Dawn's marital status "conflates the question whether a liberty interest exists with the question what procedures may be used to terminate or curtail it." (*Michael H., supra*, 491 U.S. at p. 145 [109 S.Ct. at pp. 2353-2354] (dis. opn. of Brennan, J.).) We should not "look[] at the relationship that the unwed father seeks to disrupt, rather than the one he seeks to [develop,] in determining whether he has a liberty interest in his [potential] relationship with his child. To do otherwise is to allow the State's interest in [preventing] the relationship to play a role in defining the 'liberty' that is protected by the Constitution." (*Ibid.*) "It is a bad day for due process when the State's interest in [preventing] a parent-child relationship is reason to conclude that [the opportunity to develop] that relationship is not part of the 'liberty' protected by the Fourteenth Amendment." (*Id.* at pp. 146-147 [109 S.Ct. at p. 2354] (dis. opn. of Brennan, J.); see also *State* ex rel. *Roy Allen S.* v. *Stone* (1996) 196 W.Va. 624 [474 S.E.2d 554, 563] (*Stone*) [mother's preexisting marriage to another man "alter[s] the nature and weight of the State's interests," not the existence of the natural father's liberty interest].) In short, the majority identifies no valid basis for refusing to follow *Kelsey S., supra*, 1 Cal.4th 816.[3]

After announcing that its task is to determine whether the interest Jerry asserts "finds support in our history, our traditions, and the conscience of our people" (maj. opn., *ante*, at p. 940), the majority makes no independent determination of this question, instead choosing to rely exclusively on *Michael H., supra*, 491 U.S. 110. As I have demonstrated, and as we held in *Kelsey S., supra*, 1 Cal.4th at page 837, *Michael H.* does *not* support the majority's conclusion. Moreover, had the majority independently considered the question, it would have found that in at least 20 states alleged natural fathers in circumstances similar to Jerry's are entitled to some form of a hearing before they are forever excluded from the lives of their biological

---

[3] Justice Kennard's concurring opinion, which also refuses to follow *Kelsey S.* because of Dawn's marital status (conc. opn. of Kennard, J., *ante*, at pp. 946-947), is similarly unpersuasive.

children.[4] This fact further demonstrates the unsoundness of the majority's conclusion.[5]

Finally, in holding that Jerry has no constitutional liberty interest on the facts of this case, the majority creates a potential anomaly under California law. Under decisions of our appellate courts, despite Frank's status as the child's presumed father, Jerry possibly could be held liable some day for the financial support of the child with whom he now seeks to develop a relationship. (See *Alicia R.* v. *Timothy M.* (1994) 29 Cal.App.4th 1232 [34 Cal.Rptr.2d 868] (*Alicia R.*); *County of Orange* v. *Leslie B.* (1993) 14 Cal.App.4th 976 [17 Cal.Rptr.2d 797] (*Leslie B.*).) As a result, although in the majority's view the presumption prevents a biological father who seeks involvement in his child's life from even getting a hearing, under existing California precedent it may not prevent the state from later seeking financial support from that same father. The state may thus invoke the presumption to prevent a natural father from obtaining the benefits of fatherhood, but the same natural father may not be able to invoke it to avoid the financial burdens of fatherhood. This result seems contradictory and inequitable. In my view, a biological connection that is sufficient to establish a natural father's potential financial responsibility for his child should also give rise to a constitutional interest in the opportunity to develop a relationship with that

---

[4]See *R.A.J.* v. *L.B.V.* (1991) 169 Ariz. 92 [817 P.2d 37]; *Willmon* v. *Hunter* (1988) 297 Ark. 358 [761 S.W.2d 924]; *R. McG.* v. *J. W.* (1980) 200 Colo. 345 [615 P.2d 666]; *Weidenbacher* v. *Duclos* (1995) 234 Conn. 51 [661 A.2d 988]; *Green* v. *Long* (Del. Fam.Ct. 1988) 547 A.2d 630; *Johnson* v. *Studley-Preston* (1991) 119 Idaho 1055 [812 P.2d 1216, 1219-1221]; *Simcox* v. *Simcox* (1989) 131 Ill.2d 491 [137 Ill.Dec 664, 546 N.E.2d 609, 612]; *In re Marriage of Slayton* (1996) 277 Ill.App.3d 574 [214 Ill.Dec 117, 660 N.E.2d 562]; *K.S.* v. *R.S.* (Ind. 1996) 669 N.E.2d 399; *Smith* v. *Jones* (La.Ct.App. 1990) 566 So.2d 408; *Finnerty* v. *Boyett* (La.Ct.App. 1985) 469 So.2d 287; *Turner* v. *Whisted* (1992) 327 Md. 106 [607 A.2d 935]; *In re Paternity of B.J.H.* (Minn.Ct.App. 1998) 573 N.W.2d 99; *Kelly* v. *Cataldo* (Minn.Ct.App. 1992) 488 N.W.2d 822, 826-828; *Ivy* v. *Harrington* (Miss. 1994) 644 So.2d 1218; *J. M. L.* v. *C. L.* (Mo.Ct.App. 1976) 536 S.W.2d 944, 945-947; *Matter of Paternity of Adam* (1995) 273 Mont. 351[903 P.2d 207]; *M.F.* v. *N.H.* (1991) 252 N.J.Super. 420 [599 A.2d 1297]; *Richard W* v. *Roberta Y* (1995) 212 A.D.2d 89 [629 N.Y.S.2d 512]; *Gorton* v. *Gorton* (1984) 123 Misc.2d 1034 [475 N.Y.S.2d 767]; *Gregory* v. *McLemore* (Okla.Ct.App. 1995) 899 P.2d 1189; *In Interest of J.W.T.* (Tex. 1994) 872 S.W.2d 189; *McDaniels* v. *Carlson* (1987) 108 Wn.2d 299 [738 P.2d 254]; *In re Paternity of T.R.B.* (1990) 154 Wis. 2d 637 [454 N.W.2d 561]; see also *C.C.* v. *A.B.* (1990) 406 Mass. 679 [550 N.E.2d 365, 372, fn. 10] (leaving open possibility of action "where, due to the actions of the mother, [the natural father] ha[s] not yet formed a substantial relationship with the child"); *Stone, supra,* 474 S.E.2d at page 566 (leaving open possibility of action where natural father "proves that he would share in the care of, responsibility for, and support of the child but for the mother's repudiation").

[5]In her concurring opinion, Justice Kennard also overlooks this fact in declaring that "society has consistently *denied* to the biological father in these circumstances any opportunity to establish parental rights over the child of another man's wife." (Conc. opn. of Kennard, J., *ante,* at p. 945, original italics.)

child where, as here, the natural father promptly comes forward and demonstrates a full commitment to his parental responsibilities.[6]

## C.  Due Process Entitles Jerry to a Hearing

The state procedures at issue here extinguish Jerry's constitutional liberty interest in the opportunity to develop a relationship with his alleged natural child without affording him any opportunity to be heard. As we have explained, "the reasonableness of a statutory limitation on the right to offer proof of parentage depends on circumstances prevailing in each particular case." (*Lisa R., supra,* 13 Cal.3d 636, 651, fn. 17.) We must balance Jerry's constitutional liberty interest against the state's "interest in precluding [Jerry] from offering evidence of parentage . . . ." (*Id.* at p. 650; see also *Michael H., supra,* 491 U.S. at p. 148 [109 S.Ct. at p. 2355] (dis. opn. of Brennan, J.) [due process requires consideration of state's "interest in curtailing the procedures accompanying the termination of a constitutionally protected interest"].) Among the factors that influence our determination are " 'the extent to which [Jerry] may be "condemned to suffer grievous loss," ' " and "the permanency of the threatened loss." (*Santosky* v. *Kramer* (1982) 455 U.S. 745, 758 [102 S.Ct. 1388, 1397, 71 L.Ed.2d 599] (*Santosky*).)

### 1.  Jerry's Interest Is Substantial

As I have already explained, the United States Supreme Court has considered the nature of a natural father's interest in his child several times. In those decisions, the high court has stressed that "[t]he rights to conceive and to raise one's children" are " 'essential' " and " 'far more precious . . . than property rights' [citation]." (*Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [92 S.Ct. 1208, 1212, 31 L.Ed.2d 551] (*Stanley*).) In *Lehr*, describing the "significance" of a natural father's "biological connection," the court explained: "[I]t offers the natural father an opportunity that no other male possesses to

---

[6]The majority correctly notes that *Alicia R.* and *Leslie B.* are factually distinguishable from this case. (Maj. opn., *ante,* at p. 943.) However, the majority ignores the court's broad declaration in *Leslie B.* that the presumption of a husband's paternity "cannot be applied" to "*protect*[] [a natural father] from assuming any responsibility for a child he fathered." (*Leslie B., supra,* 14 Cal.App.4th at p. 980, original italics; see also *id.* at p. 981 ["presumption was never intended as a financial prophylactic for men who have affairs with married women"].) The court reasoned that the presumption applies only where its underlying policies "would be furthered by [its] application . . . to the facts" of the particular case. (*Id.* at p. 980.) The court noted, for example, that we refused to apply the presumption in *In re Lisa R.* (1975) 13 Cal.3d 636 [119 Cal.Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017] (*Lisa R.*), because, given the presumed father's death, the policy of protecting the family unit could not be served. (*Leslie B., supra,* 14 Cal.App.4th at p. 981.) Of course, in this case, we cannot predict how the facts will later develop or whether a court will some day conclude, based on those facts, that Jerry is financially liable for Dawn's child.

develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development." (*Lehr, supra,* 463 U.S. at p. 262 [103 S.Ct. at p. 2993], fn. omitted.) Citing this passage from *Lehr,* we have observed that the high court decisions "reinforce[] the importance of genetic parents' rights. [Citations.]" (*Johnson* v. *Calvert* (1993) 5 Cal.4th 84, 98-99 [19 Cal.Rptr.2d 494, 851 P.2d 776] (*Johnson*).)

More generally, in cases involving termination of parental rights, the high court has stated that a successful termination action "work[s] a unique kind of deprivation. [Citations.]" (*Lassiter* v. *Department of Social Services* (1981) 452 U.S. 18, 27 [101 S.Ct. 2153, 2160, 68 L.Ed.2d 640] (*Lassiter*).) In this context, the court has declared that "a natural parent's 'desire for and right to "the companionship, care, custody, and management of his or her children" ' " is a "commanding" interest. (*Santosky, supra,* 455 U.S. at p. 758 [102 S.Ct. at p. 1397].) In a termination action, the state attempts " 'to destroy *permanently* all legal recognition of the parental relationship.' [Citation.]" (*M.L.B.* v. *S.L.J.* (1996) 519 U.S. 102, __ [117 S.Ct. 555, 570, 136 L.Ed.2d 473], italics added (*M.L.B.*).) A successful termination action therefore "is 'irretrievabl[y] destructi[ve]' of the most fundamental family relationship. [Citation.]" (*Id.* at p. __ [117 S.Ct. at p. 566].) In short, "[f]ew forms of state action are both so severe and so irreversible." (*Santosky, supra,* 455 U.S. at p. 759 [102 S.Ct. at p. 1398]; see also *M.L.B., supra,* 519 U.S. at p. __ [117 S.Ct. at p. 565] [" '[f]ew consequences of judicial action are so grave as the severance of natural family ties' "].) A termination decision that "effectively foreclose[s] the possibility" that a child will "ever know his natural parents" results in a "loss[] [that] cannot be measured." (*Santosky, supra,* 455 U.S. at pp. 760-761, fn. 11 [102 S.Ct. at p. 1398].) "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one."[7] (*Lassiter, supra,* 452 U.S. at p. 27 [101 S.Ct. at p. 2160], fn. omitted.)

From Jerry's perspective, California's decision to extinguish his constitutional liberty interest in his potential relationship with his alleged biological child has the effect of a successful termination proceeding. It " 'destroy[s] permanently all legal recognition' " of his biological relationship to the child. (*M.L.B., supra,* 519 U.S. at p. __ [117 S.Ct. at p. 570].) Jerry's interest in this case, therefore, is substantial. Accordingly, the Legislature's refusal to afford him any process can withstand constitutional scrutiny only if

---

[7]The majority thus errs in discounting Jerry's interest in an accurate determination of paternity. (Maj. opn., *ante,* at pp. 943-944, fn. 7.)

California "has an interest so powerful that it justifies granting [him] *no* hearing before terminating his parental rights." (*Michael H., supra*, 491 U.S. at p. 154 [109 S.Ct. at p. 2358], original italics (dis. opn. of Brennan, J.).)

## 2. *The State's Interests Do Not Justify the Absence of Process*

Although the state interests Dawn invokes here—the child's welfare and family stability—are unquestionably significant, on the facts of this case, they do not justify extinguishing Jerry's constitutional liberty interest without affording him any process. As this court has previously observed, due process generally requires that an individual receive "notice and some form of hearing before" the state deprives him of a protected liberty interest. (*Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294, 308 [138 Cal.Rptr. 53, 562 P.2d 1302] (*Kash*).) In some circumstances, important governmental interests may justify postponing notice and hearing until after the deprivation. (*Ibid.*) However, even in these circumstances, "an opportunity to be heard may only be postponed, not entirely eliminated."[8] (*Kash, supra*, 19 Cal.3d at p. 308.) In the context of proceedings to terminate parental rights, the high court has explained: "[T]hat important liberty interests of the child and its foster parents may also be affected by a permanent neglect proceeding does not justify denying the *natural parents* constitutionally adequate procedures." (*Santosky, supra*, 455 U.S. at p. 754, fn. 7 [102 S.Ct. at p. 1395], original italics.) Similarly, in this case, that affording Jerry an opportunity to be heard might affect liberty interests of Dawn, Frank, and the child does not justify denying Jerry constitutionally adequate procedures.

Indeed, in previous cases involving parental rights, we have found the state's legitimate and substantial interest in the child's welfare insufficient to justify extinguishing a natural parent's right without a hearing or categorically impairing that right. In *Lisa R.*, we balanced state and private interests to determine whether an alleged natural father could be "denied the opportunity to be heard in protection of a basic [constitutional] right." (*Lisa R., supra*, 13 Cal.3d at p. 647.) We concluded that the state's legitimate interest in the child's welfare did not justify denying the natural father a hearing,

---

[8]*Michael H.* does not constitute an exception to this rule. As I have previously explained, in concurring in the judgment in that case, Justice Stevens concluded that California's statutory scheme was "consistent with the Due Process Clause" (*Michael H., supra*, 491 U.S. at p. 136 [109 S.Ct. at p. 2349] (conc. opn. of Stevens, J.)) because it afforded the alleged natural father "a fair opportunity to show that he [was the child's] natural father" and that the child's "interests would be served by granting him visitation rights." (*Id.* at p. 135 [109 S.Ct. at p. 2348] (conc. opn. of Stevens, J.).)

noting that a court had to determine his parental fitness even if he established his biological paternity. (*Id.* at pp. 648-650 & fn. 14.) Similarly, in the case now before us, "it is important to keep in mind that the question at issue . . . is not whether [Jerry] should be granted visitation or custody but simply whether he can take the first step in any such proceeding." (*Michael H.*, *supra*, 491 U.S. at p. 161, fn. 3 [109 S.Ct. at p. 2361] (dis. opn. of White, J.).) Jerry's constitutional liberty interest "only entitle[s] [him] to an opportunity to request to invoke his parental rights; . . . it would remain for [a] court to determine issues of visitation, custody, etc., based on the best interests of the child. [Citations.]"[9] (*Stone, supra*, 474 S.E.2d at p. 566.)

In *Kelsey S.*, we again considered the extent to which the state's interest in the child's welfare may justify categorically impairing a natural father's constitutional rights. There, we held that the state may not constitutionally authorize an adoption over the objection of a natural father who demonstrates a full commitment to his parental responsibilities, absent a showing of his unfitness. (*Kelsey S., supra*, 1 Cal.4th at p. 821.) In reaching this conclusion, we rejected the notion that the state's interest in placing the child with an adoptive couple, rather than with the natural father, justified adoption without the natural father's consent. We explained: "[T]he constitutionally valid objective is the protection of the child's well-being. We cannot conclude in the abstract that *adoption* is itself a sufficient objective to allow the state to take whatever measures it deems appropriate. *Nor can we merely assume, either as a policy or factual matter, that adoption is necessarily in a child's best interest*. This assumption is especially untenable in light of the rapidly changing concept of family." (*Id.* at p. 845, second italics added.)

Here, too, we cannot "merely assume, either as a policy or factual matter," that simply because Dawn was married at the time of the child's conception and birth, Jerry's exclusion from the child's life "is necessarily in [the] child's best interest." (*Kelsey S., supra*, 1 Cal.4th at p. 845.) There may very well be circumstances in which allowing contact with the natural father will be in the child's best interest, even where a presumed father existed at the time of the child's birth.[10] Thus, assuming that Jerry is the child's natural father, a court must make an individualized determination of the child's best interest in determining the extent, if any, of Jerry's parental rights. (See

[9] I refer to the "best interest" standard because of existing California family law statutes. (See § 7637 [judgment in paternity action may address any matter in child's "best interest," including custody and visitation issues].)

[10] For example, exclusion of the natural father may not be in the child's best interest where the mother intends to leave her husband soon after the child's birth, or where the husband ceases to have contact with the mother and the child, or is abusive, or is incarcerated for an extended period.

*Stanley, supra*, 405 U.S. at p. 656 [92 S.Ct. at p. 1215] [state may not justify denying alleged natural father a hearing by asserting that unmarried fathers are seldom fit].)

Nor does the state's interest in family stability justify denying Jerry constitutionally adequate procedures. "Not all petitions challenging the paternity of marital children threaten" this state interest. (*Stone, supra*, 474 S.E.2d at p. 565.) As I have explained, in determining whether the state may constitutionally deny an alleged natural father an opportunity to assert his claim, we must consider the "circumstances prevailing in each particular case." (*Lisa R., supra*, 13 Cal.3d at p. 651, fn. 17.) In this case, as previously noted, Dawn continued to have contact with Frank during the three-month period she openly lived with Jerry, so Frank "was well aware of the liaison between [Dawn] and [Jerry]." (*Michael H., supra*, 491 U.S. at p. 162 [109 S.Ct. at p. 2362] (dis. opn. of White, J.).) Because Frank probably "already knows the child is not his, [it is] less likely that the paternity hearing will disrupt an otherwise harmonious and apparently exclusive marital relationship." (*Michael H., supra*, 491 U.S. at p. 120, fn. 1 [109 S.Ct. at p. 2340] (plur. opn. of Scalia, J.); see also *Michael M.* v. *Giovanna F.* (1992) 5 Cal.App.4th 1272, 1284 [7 Cal.Rptr.2d 460] [no threat to family unity where man and pregnant woman marry knowing that another man is the unborn child's biological father]; *In Interest of J.W.T, supra*, 872 S.W.2d at p. 197 [state's interest in family stability diminished given mother's choice " 'to engage in sexual relations outside of marriage' "].) As also previously noted, Jerry submitted evidence that Dawn initially intended to marry him and raise children with him, and that he took action in anticipation of these events. In previous cases involving conflicting claims of parentage, we have given controlling weight to the "acted-on intention" of the parties to have a child. (*Johnson, supra*, 5 Cal.4th at p. 93.) Accordingly, on the facts of this case, the state's interest in family stability does not justify extinguishing Jerry's constitutional liberty interest without affording him an opportunity to be heard. A court's ability, and obligation, to consider the potential impact on the marital family in determining Jerry's custody and visitation request are adequate to protect the state's interest in family stability. (See *Stone, supra*, 474 S.E.2d at pp. 566-567; see also *Boddie* v. *Connecticut* (1971) 401 U.S. 371, 381 [91 S.Ct. 780, 787-788, 28 L.Ed.2d 113] (*Boddie*) [complete denial of due process is impermissible where "alternatives exist" to protect state's interests].)

D. *The State Has Considerable Discretion Regarding the Form of Hearing*

My conclusion that Jerry has a constitutional right that entitles him to due process gives rise to the question of precisely what process is due. "Due

process of law guarantees 'no particular form of procedure . . . .' " (*Mitchell* v. *W. T. Grant Co.* (1974) 416 U.S. 600, 610 [94 S.Ct. 1895, 1801, 40 L.Ed.2d 406].) Rather, as noted, we use "a weighing process" to determine "the form of hearing required . . . ." (*Roth, supra,* 408 U.S. at p. 570 [92 S.Ct. at p. 2705], italics omitted.) Thus, "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved . . . ." (*Boddie, supra,* 401 U.S. at p. 378 [91 S.Ct. at p. 786].)

Although the constitutional right Jerry asserts here is essentially of the same type and magnitude as the right that the natural father asserted in *Kelsey S.*, the countervailing interests in this case are more substantial than in the latter case. First, the natural father in *Kelsey S.* had a constitutional right that the prospective adoptive parents did not have. He therefore had a constitutional priority that the state could not extinguish absent a showing of unfitness. (*Kelsey S., supra,* 1 Cal.4th at p. 849.) Here, Jerry enjoys no constitutional priority. An exercise of his right necessarily conflicts with the right of Dawn and Frank to form a family unit and raise the child as they see fit. (See *Stanley, supra,* 405 U.S. at p. 651 [92 S.Ct. at pp. 1212-1213] [due process clause protects the "integrity of the family unit"].) Moreover, the natural father in *Kelsey S.* sought sole custody of the child, i.e., a unified, although perhaps single-parent, family. By contrast, Jerry seeks only legal custody and visitation. The state has a strong interest in fostering, at the outset of a child's life, a unified family with a single father. Thus, the state's preference that the father be the man who is married to the mother rather than the natural father is not arbitrary or irrational. Furthermore, although Jerry's opportunity interest is significant, it is less weighty than the interest of an unmarried father who has already formed a relational bond with the child. (See *Lehr, supra,* 463 U.S. at p. 262, fn. 18 [103 S.Ct. at p. 2994] [father who has played substantial role in child's rearing has "greater claim to constitutional protection" than "mere biological parent"].)

Therefore, although alleged natural fathers like Jerry have the right to some form of process, given the competing interests, the state has considerable leeway to build into that process a preference for the presumed father as the child's sole father. Not only may the state deny the natural father visitation or custody based on the child's best interest (see § 7637), it may, for example, establish a rebuttable presumption that giving sole custody to the mother and presumed father, and denying any rights to a natural father who is not the presumed father, best serves a newborn child's interests. Moreover, the state has considerable discretion to prescribe the procedure, including the applicable standard of proof, governing an alleged natural

father's attempt to rebut that presumption. Even absent a statute, the child's interest in family stability and unity would justify in many, and perhaps most, circumstances a court's decision to deny the natural father any access to a child who resides in a reasonably stable two-parent home consisting of the mother and presumed father.

However, as I have explained, no credible state interest justifies completely denying the natural father an opportunity to rebut an explicit or implicit presumption in favor of the presumed father—for example, to show by clear and convincing evidence that no stable family unit exists, or that the mother and presumed father do not meet certain basic standards of fitness. A denial of this minimal due process disregards the natural father's constitutional right without advancing a legitimate government interest in the child's welfare.

Finally, the state also has considerable flexibility in designing procedures to protect the privacy and other interests of the parties. As a majority of the high court held in *Michael H.*, "[i]t is no conceivable denial of constitutional right for a State to decline to declare facts unless some legal consequence hinges upon the requested declaration." (*Michael H., supra,* 491 U.S. at p. 126 [109 S.Ct. at p. 2344] (plur. opn. of Scalia, J.); see also *id.* at pp. 132-133 (conc. opn. of Stevens, J.).) Thus, the state may, for example, provide for an in camera hearing during which an alleged father must first show that, assuming his biological paternity, granting him any relief or legal right would be in the child's best interests. If he does not make this preliminary showing, he could not proceed to establish his paternity. (See *Stone, supra,* 474 S.E.2d at pp. 567-568; see also *Weidenbacher* v. *Duclos, supra,* 661 A.2d at p. 1000 [court must make preliminary determination regarding child's best interest].) The state also may require expeditious adjudication of these issues, so as to minimize disruption to the child's life. In short, the state may constitutionally establish procedures that promote the stability of the traditional family unit.

## III. Conclusion

In finding that Jerry is constitutionally entitled to some form of process under the facts of this case, I "do not intend, in any way, to denigrate the importance of the traditional family unit or the institution of marriage. To the contrary, [I] continue to believe that the family provides the foundation upon which our society is built and through which its most cherished values are best transmitted. [My view] of this case merely recognizes the reality

that nontraditional living arrangements do exist, that recognized liberty interests can arise from such arrangements, and that furtherance of the State's interest in preserving family and marital stability does not require an absolute bar to the rights of putative natural fathers." (*Stone, supra,* 474 S.E.2d at p. 569.) Therefore, I would affirm the judgment of the Court of Appeal denying the petition for writ of mandate.

Mosk, J., concurred.