[No. G022651. Fourth Dist., Div. Three. May 27, 1999.]

In re ARIEL H., a Minor.
DENNIS H. et al., Petitioners and Respondents, v.
JOSHUA P., a Minor, Objector and Appellant.

JOSHUA P., a Minor, Plaintiff and Appellant, v.
LISA H., Defendant and Respondent.

## COUNSEL

Etcheverry & Barnes, Louis P. Etcheverry and Paige M. Barnes for Objector and Appellant and for Plaintiff and Appellant.

Bonnie J. Hiler; and Jane A. Gorman for Petitioners and Respondents.

Tisha L. Harman for Defendant and Respondent.

## OPINION

**SILLS, P. J.**—An unwed biological father who promptly assumes parental responsibilities of his natural child will be declared the minor's presumed father unless the court finds him unfit. In this case, the biological father was just 15 years old. While physically mature, his emotional immaturity caused him to avoid making even minimal effort to assume parental responsibilities until after the child was born and his parents were served with the adoption papers. The biological father relies on his minority to excuse his failure to promptly assume parental responsibilities. The court was unimpressed with his argument. We are less so, and affirm.

### I

Ariel H. was born in May 1997. Her father, Joshua P., was 15 years old. Her mother, Lisa H., was but 17 years old. After Ariel was born, Lisa turned her over to Dennis and Diane H. (no relationship to Lisa). The adoptive parents filed a petition to determine if Joshua had parental rights, and whether his consent was necessary for Ariel's adoption. Joshua then filed a complaint to establish parental rights and obtain custody. Following a contested hearing, the court determined that Joshua was not the presumed father and his consent to the adoption was unnecessary. The court terminated his parental rights, and Joshua appeals.

### II

Joshua makes three constitutional arguments. He argues that due process requires a showing of unfitness before a minor can be taken away

from her natural parents, the gender-based distinction between unmarried mothers and unmarried fathers violates equal protection because the artificial distinction does not bear a substantial relation to the state's interest in providing adoptive homes to minors of unmarried parents and, with respect to a natural father who is a minor, Family Code section 7611 violates equal protection because it unfairly requires a father to physically receive the newborn child into his home.

As Joshua concedes in his reply brief, our Supreme Court has considered and rejected these same issues. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216].) In *Kelsey S.*, the Supreme Court interpreted Civil Code former section 7004, which has since been renumbered Family Code section 7611. In the summary of its holding, the high court stated that Civil Code former section 7004 "violates the federal constitutional guarantees of equal protection and due process for unwed fathers *to the extent that* the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest. If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother.

"A court should consider all factors relevant to that determination. The father's conduct both *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' . . . A court should also consider the father's public acknowledgment of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child.

"We reiterate and emphasize the narrowness of our decision. The statutory distinction between natural fathers and presumed fathers is constitutionally invalid *only to the extent* it is applied to an unwed father who has sufficiently and timely demonstrated a full commitment to his parental responsibilities.

Our statutes . . . are constitutionally sufficient when applied to a father who has failed to make such a showing." (*Adoption of Kelsey S.*, *supra*, 1 Cal.4th at pp. 849-850, citations and fns. omitted, italics in original.) The trial court found that Joshua had failed to timely demonstrate a full commitment to his parental responsibilities, and thus these constitutional arguments must fail. (Cf. *Dawn D.* v. *Superior Court* (1998) 17 Cal.4th 932, 942 [72 Cal.Rptr.2d 871, 952 P.2d 1139].)

### III

■ Having dispensed with the constitutional arguments, we turn to Joshua's claim no substantial evidence supports the decision.[1]

Joshua concedes that if he were an adult, substantial evidence would support the court's finding. While eager to participate in the procreating part—Joshua apparently had unprotected sex with Lisa at least 40 times—he never made a serious effort to assume the true mantel of fatherhood. After he was told of Lisa's pregnancy, he continued to "hang out" with his buddies at the mall and spend what money he earned on compact discs even though he knew she was pregnant and about to give birth. He did not go to see his child, nor did he protest Lisa's stated intention of placing the baby with an adoptive family. More importantly, he never told his parents about the baby or otherwise publicly acknowledged his paternity.

In his opening brief, Joshua attempts to excuse his inaction by arguing that it is "unreasonable to require a minor to notify his parents immediately when he gets himself into a situation which he cannot handle. He is immature and cannot react as an adult." Optimistically, he says "he thought that after the birth of the child, things would smooth out and he would be able to talk to the natural mother, and the natural mother would bring the child over to his house and then they would be able to disclose the fact of the birth to his parents, and everything would work out from that point." This entire argument, of course, is based on the false premise that a biological father who is a minor should not be held to adult standards of behavior.

We would remind Joshua that to be declared a presumed father he must first show he has assumed parental responsibilities for the minor. A parent, by definition, is someone who protects, guards, and nurtures a child, physically and emotionally. Equally obvious is that a child cannot parent a child. Here, Joshua concedes he did not exhibit maturity in handling the situation.

---

[1] Joshua also asserts the court denied him due process since it terminated parental rights without considering the report prepared by the department of social services. Not so. The report required by Family Code section 7663 was before the court.

Yet he thinks it would be "unreasonable" to deny him the opportunity to parent the minor solely because he acted immaturely. Joshua misses the point. The first two paragraphs of a recent essay by Jill Smolowe entitled *Baby Knows Best: Parenthood is Made of More Than Genetic Material* (Aug. 17, 1998) Time, p. 66) explains what parenting really involves:

"Remember Horton the elephant? One day he stumbles upon Mayzie, a bird who has no interest in hatching her egg. After coaxing Horton to mount a tree and sit upon her nest, she vanishes. As events unfold in Dr. Seuss's whimsical Horton Hatches the Egg, Horton sits resolutely, unbudged by jeers, inclement weather or nasty humans, who cart him off, tree and all, to be a sideshow in a circus. When Mayzie happens by Horton's tent and sees that most of the work is done, she demands her egg back. Just then, the egg cracks open and out pops a tiny elephant with wings. Horton triumphantly returns home to cheers with his baby. It's perfectly clear to all (save Mayzie) who the real parent is.

"Parents of the '90s tend to read this 1940 story searching for dark lessons about birth parents, surrogacy and who knows what else. But small children still love it. That's because the Mayzie vs. Horton dustup affirms what they already know: *real* parents are people who are dedicated and unshakably there for you, day in and day out. Period. In their limited world view, the parent-child connection is not spun from DNA. Rather, it's woven with the mundane strands of everyday life, the countless gestures, large and small, that repeatedly reaffirm: I see you, I love you; I am yours, you are mine." (Smolowe, *Baby Knows Best: Parenthood is made of more than genetic material,* Time, *supra,* at p. 66.) Unfortunately, Joshua is no Horton.

The judgment is affirmed. The mother and the adoptive parents shall recover their costs on appeal.

Rylaarsdam, J., and Bedsworth, J., concurred.