Filed 7/3/25  In re A.D. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re A.D., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E085132 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ2100555) |
| v. | OPINION |
| Ciara D. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge. Conditionally reversed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant Ciara D.

Michelle D. Pena, under appointment by the Court of Appeal, for Defendant and Appellant Arrion W.

1

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

The Riverside County Department of Public Social Services (the Department or DPSS) filed a petition on behalf of then nine-year-old A.D. alleging her mother, Ciara D.'s (Mother), and father, Arrion W.'s (Father 1) neglect and failure to supervise, within the meaning of Welfare and Institutions Code[1] section 300, subdivision (b)(1). The Department's intervention was precipitated by a pair of referrals grounded on Mother's mental health issues and substance use, and the fact Father 1's whereabouts and ability to provide for A.D. were unknown. Jurisdiction over A.D. was established, and reunification services were ordered for Mother, but she persistently failed to address her mental health issues (characterized by delusions), and she refused to submit to drug testing throughout the reunification period. Services for Father 1 were denied because he was merely an alleged father and had not made himself available to the Department. Services for Mother were terminated at the 12-month status review hearing.

The juvenile court found that the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) did not apply because Mother denied any Native American ancestry in the earlier stages of the dependency.

Inquiry into the possibility of Native American heritage was later re-initiated during the dependency when Mother informed the court she may have Indian ancestry

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

through the Blackfeet tribe.  The Department inquired of relatives and contacted the Bureau of Indian Affairs (BIA) as well as the relevant tribes, but the responses indicated that A.D. was not an Indian child, nor eligible for tribal membership, so the court again found that ICWA did not apply at the section 366.26 hearing.

In the meantime, the Department had located Father 1, who denied being A.D.'s father because he had been incarcerated for two years at the time of A.D.'s birth, making it impossible for him to be the biological father of A.D.  Nevertheless, at the hearing conducted pursuant to section 366.26, Father 1 requested a continuance to seek DNA testing to determine if he could be A.D.'s father, which was denied.  The court found A.D. was adoptable and terminated parental rights.  Both parents appeal.

On appeal, Mother argues that the juvenile court and the Department failed to comply with the duty of inquiry under ICWA, and Father 1 joins this claim.  Separately, Father 1 argues that his due process rights were violated by the denial of his request to continue the hearing so that he could be personally present at the selection and implementation hearing and to facilitate paternity testing.  We conditionally reverse.

### BACKGROUND

A detailed rendition of the factual history is unnecessary for the resolution of the issues, so we summarize as follows.[2]  In August 2021, and again in October, referrals for general neglect was made alleging that on August 18, A.D. and her younger half-sibling were seen walking outside a liquor store unsupervised and unkempt.  The younger half-

---

[2] This appeal involves only A.D., so we omit information about her younger half-siblings except where necessary for context.

sibling was wearing only a diaper and ran after the car in which Mother was driving as she pulled out of the parking lot. Someone grabbed A.D. and her half-sibling and took them home. On August 26, Mother denied having any Indian ancestry.

The second referral for neglect was made to the Department when Mother was reported to have said she wanted to drown her children. A check of local schools had revealed that A.D. was not currently enrolled in school. After contacting the maternal great-grandmother, Deborah E., in Los Angeles, it was learned that A.D. was being homeschooled there.

The Department contacted Mother as part of its investigation, who informed the social worker Mother may be bipolar, and that the father, Damian G. (Father 2) of A.D.'s younger half-siblings was supposed to be watching the children. Mother made bizarre statements about the reasons for the referral when contacted by the social worker, who discovered the home was filthy, the yard littered with trash and broken furniture, and the children were unkempt. At a follow up visit with Mother, the trash was cleared but Mother, who admitted using marijuana daily, refused to drug test. At another follow-up visit with a different social worker, Mother expressed fear that the Department intended to clone her children.

The information from numerous home visits caused the Department to be concerned for the children's safety, including statements by the paternal grandmother of the younger children that Mother wanted to drown the children, and that Mother had physically abused them with a cord, leaving marks. At this time, A.D. was staying with her maternal great-grandmother in Los Angeles, where she was being homeschooled.

Mother finally agreed to a saliva test for drugs, which was negative for all substances, but the amphetamine bottom line was half faint. Mother tested positive for marijuana in a separate drug test. Mother also agreed to a mental health evaluation, but she was uncooperative with the evaluator, who could only conclude that Mother suffered from delusions. Mother refused to participate in therapy because she denied having mental health problems.

Father 2 of the younger children took them to Los Angeles to stay with the maternal great-grandmother as part of a safety plan for the children. The maternal great-grandmother confirmed A.D. had been staying with her, but she did not know anything about A.D.'s biological father except that his first name was Darrion or Arrion. There is no indication in the reports that the social worker asked the maternal great-grandmother about possible Native American heritage.

The children were later brought back to Riverside County by Father 2, but the social worker would not authorize placement of A.D. with Father 2 because he was not A.D.'s biological father, so A.D. was then taken into protective custody. When the social worker contacted Mother to inform her of A.D.'s status, Mother informed the social worker that the father of A.D. was Father 1.

On November 10, 2021, a dependency petition was filed on behalf of A.D., pursuant to section 300, subdivisions (b)(1) and (g). The factual bases for the petition were that Mother had unresolved mental health issues (par. b-1), that Mother used marijuana and drug testing revealed methamphetamine use (par. b-2), that Father 2 of the

younger children neglected the health and safety of the children (par. b-2),[3] that Father 1, was not a member of the household and failed to provide for A.D. (par. b-3), and that Father 1's whereabouts were unknown and he was unable to provide A.D. with care and support (par. g-1). The petition included a statement that the social worker had completed an inquiry under ICWA.

On November 12, 2021, the detention hearing was held, and A.D. was detained as to both Mother and Father 1. Neither Mother nor Father 1 was present, so no ICWA Form-020 was submitted, and the court could not inquire in open court. The court found that ICWA did not apply.

The jurisdiction report was filed on December 2, 2021, summarizing the family's prior child welfare history. The social worker reported that ICWA did not apply because Mother denied Indian ancestry and the court previously found that ICWA did not apply. The report also summarized search efforts to locate Father 1. A.D. was placed in the "Child Net-Foster Family Network."

On January 7, 2022, the Department filed a first amended petition, correcting the spelling of the name of one of the younger half-siblings, correcting the date of birth of another half-sibling, and striking allegation in paragraph B-3, pertaining to the Father 2. The matter was continued upon the filing of the amended petition.

On February 10, 2022, an addendum report was filed, describing efforts to identify a relative placement for A.D. A maternal aunt in Philadelphia, Pennsylvania, Donna G.,

---

[3] The petition includes two allegations having the same paragraph number.

expressed an interest in placement, and A.D., who was familiar with this aunt, was interested in speaking to her. Another maternal relative, Shiree R., also requested to contact A.D., and was also interested in placement of A.D. The report does not indicate if ICWA inquiry was made respecting these relatives.

At this time, Mother was living in Los Angeles and wanted to visit the children but had no transportation. Mother expressed the desire to have the case transferred to Los Angeles. The jurisdiction hearing was again continued to give Mother a chance to review the social worker's reports.

Another addendum report was filed on March 25, 2022, indicating that Mother was couch-surfing in Los Angeles, with no stable residence. Mother informed the social worker that she had started services and wished to speak to her children. Mother also informed the social worker that she had no transportation to attend visits, as she was coming from Los Angeles. Mother indicated she had completed a mental health assessment but could not provide information regarding the location of any services she received. On March 30, 2022, the court ordered the Department to provide bus passes to Mother, and to continue efforts to locate Father 1.

The visit between Mother and A.D. was arranged and appeared to go well. However, a subsequent Zoom visit between Mother and A.D. was cut short by the caregiver when Mother spoke to A.D. about not vaping and using drugs. During this visit, the caregiver had attempted to redirect the conversation, but Mother had become aggressive, causing A.D. to not show herself on camera so as to not reveal she was

crying.  Mother then began praying for A.D. to keep the devil away, at which the caregiver ended the visit.

The jurisdiction hearing was continued again due to an incident involving Father 2 which led to his arrest and the detention of his children.  A second amended petition added allegations relating to Father 2.

On May 26, 2022, another addendum report was filed relating to the new allegations.  The social worker included in this report information obtained from Mother indicating she had located Father 1.  However, there is no indication in the addendum as to where she had located Father 1 or whether the social worker had followed up on that information.

On June 1, 2022, the combined jurisdiction/disposition hearing took place. Mother appeared telephonically and requested that the matter be transferred to Los Angeles, but that request was denied because jurisdiction had not been established.  There is no indication in the record that relatives other than Mother and Father 2 were in attendance.  Mother requested a *Marsden*[4] hearing when the case was initially called, and an in camera proceeding took place, with the remaining matter placed on a second call. When proceedings resumed, Mother was no longer present.

However, the court noted that during the in camera hearing, Mother had mentioned the "Shanghi" Tribe.  The Department submitted on the social worker's reports and the court found good service as to Father 1.  The court ordered the Department to conduct

---

[4] Referring to *People v. Marsden* (1970) 2 Cal.3d 118.  Mother's request was denied.

further inquiry into Mother's information about possible Native American ancestry, finding that ICWA may apply, although the court could find no reference to a tribe by that name on the internet. The court found that A.D. was a person described by section 300, subdivisions (b)(1) and (g), and declared her a dependent of the court. The court made findings pursuant to section 361, subdivision (c)(1), and removed physical custody of A.D. from Mother and Father 1. The court ordered reunification services for Mother, but denied services to Father 1 because his whereabouts were unknown, within the meaning of section 361.5, subdivision (a), and because services for Father 1 were not in the best interests of A.D. The court ordered Mother to submit to a psychological evaluation, and also ordered the Department to continue efforts to locate a relative placement for A.D.

After the hearing, the Department requested the initiation of proceedings under the Interstate Compact for the Placement of Children (ICPC), respecting the maternal aunt in Philadelphia. The court ordered the ICPC as recommended with an additional order that A.D. not be moved without 10 days' notice to all counsel.

In November 2022, the Department submitted its six-month status review report recommending that A.D. remain placed out of the home. At this time, A.D. was in a new placement with a Sunshine Family Services home. Regarding ICWA, the report included information that the social worker had made further ICWA inquiry and had provided maternal and paternal relative responses and information to the ICWA noticing clerk, and that notice had been provided to the BIA and to all identified tribes. Referring to the parent locator request of January 3, 2022, the social worker indicated that the results of the search were that Father 1 was not located.

9

Contact with Mother revealed she was homeless in Los Angeles, continued to deny having a mental health condition, and she was not taking any medications because she did not believe in them. Mother was actively receiving CalWORKs funding as a pregnant woman but refused to tell the social worker when the baby was due and refused to name the father, except to indicate that Father 2 was not the father of the unborn child.

Mother was also enrolled in a Los Angeles County program called Shield for Families, which the social worker confirmed. Mother had participated in a psychological evaluation which revealed significant mental health problems, including a possible delusional disorder or bi-polar disorder or both, posttraumatic stress disorder, and cannabis related disorder. The evaluator recommended regular treatment and medication for Mother.

Regarding possible relative placement for A.D., who had been moved to a new placement in July 2022, the social worker stated that the ICPC respecting the maternal aunt in Philadelphia had been initiated, but did not include any information about contacts with A.D.'s relative. Mother requested that the social worker contact her aunt Gina or Gena S. for a statement about Mother's ability to parent, but Mother did not provide any contact information for this relative.

On November 2, 2022, the Department submitted an ICWA review reporting on further inquiry that had been conducted and additional information. The Department's letter to the BIA indicated that Mother reported she is from the Blackfoot (not Blackfeet) Shanghai tribe, which was not a federally recognized tribe. It also indicated that the

maternal aunt in Pennsylvania denied any Indian ancestry. There is no indication that the social worker made inquiries of other relatives.

On November 15, 2022, the court conducted the six-month status review hearing, at which Mother was present. Mother, who had moved back to Riverside County, requested referrals for an outpatient program or outpatient substance abuse program, because she did not have any. Mother's counsel also requested that the Department assist Mother with housing referrals insofar as she was still homeless. The court continued reunification services for Mother.

On November 30, 2022, the social worker submitted the 12-month status review report, recommending that Mother's reunification services be terminated and that her visits with A.D. be reduced to one time per month. This report included a recommendation for a finding that ICWA does not apply. The report indicated that the Department conducted further ICWA inquiry of maternal and paternal relatives, without identifying which relatives, and provided the information to the noticing clerk. Mother's information regarding Native American heritage identified the Blackfoot Shanghai Tribe, and the Department provided notice to all the identified tribes as well as the BIA. Because the Blackfoot Shanghai Tribe is not federally recognized, ICWA does not apply.

The report did not include any updated information about the ICPC process for possible placement of A.D. with her maternal aunt in Pennsylvania, but A.D. expressed that she would like to live with the maternal aunt if reunification with Mother was not possible. The report also indicated that the social worker requested that Mother submit to an on-demand drug test, but an addendum report indicates Mother did not comply.

11

The later addendum also reflected that Mother's visits with her children were problematic, in that Mother was loud and scattered. In addition, A.D. had been moved to a new placement because the previous foster family agency was no longer able to take foster children. During the social worker's contact with A.D., the child expressed that visiting with her younger half-siblings was the best thing ever, but did not talk about her Mother. A.D. requested only sibling visits. The Department recommended that services to Mother be terminated, and visitation be reduced.

The 12-month review hearing took place on January 9, 2023; Mother was present in court for the hearing. At the hearing, Mother apprised the court that of another maternal relative who was interested in placement of A.D., a great-aunt named Gina T., who lives in Arkansas. The court found that ICWA did not apply, and that A.D. was not an Indian child. By clear and convincing evidence, the court found Mother had failed to participate regularly and make substantive progress in her service plan, and there was no possibility A.D. would be returned to her custody if she were given six months of additional services. The court terminated Mother's reunification services and set a section 366.26 hearing but left the visitation order unchanged. The court also authorized telephonic and video visits for A.D. with relatives in Pennsylvania and Arkansas and directed that the Department initiate an ICPC with the state of Arkansas.

On April 26, 2023, the social worker submitted a report for the selection and implementation hearing pursuant to section 366.26. The report noted that the ICPC for the State of Pennsylvania had been initiated, but that A.D. no longer wanted to move from California. As for the ICPC for the State of Arkansas, the report notes that the

12

maternal great-aunt had never contacted the Department to initiate the request, and Mother had failed to provide information such as a telephone number to facilitate initiation of the request. The report noted that the ICPC had made no progress, A.D. was unwilling to move to Pennsylvania and was unwilling to even discuss telephone calls with the maternal aunt; further, Mother did not want A.D. to go, and, in turn, A.D. did not want to leave her younger half-siblings.

Additionally, A.D. had not requested to have visitation with Mother. The Department recommended that the section 366.26 hearing be continued to identify a permanent placement for A.D., as well as authorization for the Department to provide media coverage and inclusion in "The Heart Gallery" for the purposes of finding a permanent placement for A.D.

Regarding ICWA, the report again summarized inquiry efforts made after June 1, 2022, when Mother made the statement of tribal affiliation, conducting further inquiry of maternal and paternal relatives, and the court's previous finding that the Department had made sufficient inquiry in concluding that ICWA did not apply.

The section 366.26 hearing was continued multiple times in order to identify a permanent placement for A.D. On August 31, 2023, the social worker submitted an addendum report to inform the court that A.D. was in the process of being moved to an adoptive home after several trial visits. A.D.'s placement occurred on September 13, 2023, and the placement family was interested in adoption.

On January 3, 2024, another addendum to the section 366.26 report was filed, again recommending the continuance of the section 366.26 hearing to further establish

13

the permanent plan of adoption. The report notes that Mother had requested visits with A.D., but that A.D. had declined visits. The selection and implementation hearing was continued again for, among other reasons, preliminary adoption assessment, which was finally provided in an addendum report filed on September 12, 2024. In the meantime, the addendum filed on September 16, 2024, indicated that Father 1 had been located in a state prison, requiring an additional continuance to submit a transportation order so Father 1 could be transported to court. On October 28, 2024, the court issued an Order for Prisoner's Appearance at the section 366.26 hearing, which was presumably[5] sent to the institution, along with notice to Father 1 of the hearing on the selection and implementation of the permanent plan, and a form entitled "Prisoner's Statement Regarding Appearance at the Hearing Affecting Parental Rights."

On October 2, 2024, the social worker contacted Father 1, who indicated he did not know Mother and could not be A.D.'s father because his first prison term was served between 2010 and 2020, so he would have been in prison for two years at the time of A.D.'s birth (born in 2012).

The section 366.26 hearing was finally held on November 13, 2024, with Mother present in court, and Father 1 present by telephone. Father 1 now believed he was A.D.'s father and requested a continuance to obtain paternity testing and to be transported to the court so he could be personally present. Mother joined in Father 1's requests so he could elevate his status in the proceedings to that of a presumed father.

---

[5] Where the record is silent, a Court of Appeal will ordinarily presume an official duty has been regularly performed. (See Evid. Code, § 664.)

14

The court denied this request because Father 1's "last-minute change of heart that he now is claiming that he is the father of [A.D.] and believes that he was the father of [A.D.] is too little too late." The court then proceeded to find that A.D. was likely to be adopted, and that termination of parental rights would not be detrimental to A.D. The court terminated the parental rights of Mother and Father 1.

Both Mother and Father 1 timely appealed.

## DISCUSSION

### 1. *Father 1's Due Process Rights Were Not Implicated or Violated by the Denial of a Continuance to Obtain Paternity Testing*

Father 1 argues that the juvenile court erred in denying his request to continue the selection and implementation hearing in order to permit him to obtain paternity testing and to facilitate his in-person appearance at the hearing. We disagree.

"Section 352 provides that a continuance shall be granted only on a showing of good cause and shall not be granted if it is contrary to the minor's best interests." (*In re Ninfa S.* (1998) 62 Cal.App.4th 808, 810.) Continuances are discouraged (*Jeff M. v. Superior Court* (1997) 56 Cal.App.4th 1238, 1242) and we reverse an order denying a continuance only on a showing of an abuse of discretion. (*In re Gerald J.* (1991) 1 Cal.App.4th 1180, 1187.)

Father 1 argues that the denial of the continuance violated his right to due process of laws because the denial of the continuance violated his right to be physically present at the hearing pursuant to Penal Code section 2625.

15

"Penal Code section 2625 requires a court to order a prisoner-parent's temporary removal and production before the court *only* 'where the proceeding seeks to terminate the parental rights of [the] prisoner' under [section 366.26] or Family Code section 7800 et seq. or 'to adjudicate the child of a prisoner a dependent child.' (Pen. Code, § 2625, subds. (b), (d).)" (*In re Jesusa V*. (2004) 32 Cal.4th 588, 599.)

We observe that on the second page of the order for prisoner's appearance, under item no. 3, the form states, "To the parent: You have a right to be physically present at the hearing described in 1 and 2a or 2b. Fill out the attached Prisoner's Statement Regarding Appearance at Hearing Affecting Parental Rights (form JV- 451) and tell the court whether you want to be physically present at this hearing."[6] (Boldface omitted.) The attachment to which this statement refers was not executed by Father 1 and he was not transported to the court, although his telephonic appearance at the hearing was arranged.

Thus, while the court issued an order for Father 1's transportation to the hearing should he so request, the second part of the form in which the incarcerated parent can request to be present at the hearing does not appear to have ever been executed by

---

[6] At oral argument, Father 1's counsel noted that the copy of the order and attachments that are found in the record are those which were prepared by trial counsel and filed and that the absence of the completed statements by the prisoner was due to the fact that the executed order was not filed. We accept this statement, but the fact Father 1 was able to participate at the hearing with the cooperation of the prison indicates that the signed order was served on the institution, and was able to and did appear telephonically is circumstantial evidence the prison received the order and informed Father 1 of it, that he was aware of the order and the date of the hearing, as well as the name of the attorney who prepared the order on his behalf.

Father 1 when the order was sent to the institution. There was no violation of Penal Code section 2625 in light of Father 1's failure to request to be transported to court, in order to facilitate his personal appearance. Father 1 could have informed the institution of his intent to be physically transferred and could have contacted his appointed counsel as soon as he learned he would not be physically transported.

As to Father 1's claim this substantive due process right to a familial relationship with A.D. was violated by the denial of a continuance, our Supreme Court jurisprudence has rejected that notion, concluding instead that "a biological father's mere desire to establish a personal relationship with the child is not a fundamental liberty interest protected by the due process clause." (*Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 942 (*Dawn D.*); see *In re Christopher M.* (2003) 113 Cal.App.4th 155, 160 (*Christopher M.*).)

Instead, the state and federal Constitutions protect the familial relationships that develop and are maintained. (See *Dawn D.*, *supra,* 17 Cal.4th at p. 942.) Father 1 lacked a substantive due process right to establish his biological paternity at this stage of the proceedings as he was an alleged father who denied paternity at a time when he could have requested paternity testing before the section 366.26 hearing.

The next question is what process is due to Father 1. "'Since the interest of a parent in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights [citations], the state, before depriving a parent of this interest, must afford him adequate notice and an opportunity to

17

be heard.'" (*Adoption of B.C.* (2011) 195 Cal.App.4th 913, 924–925, citing *In re B. G.* (1974) 11 Cal.3d 679, 688–689.)

Under both the state and federal Constitutions, "we balance similar factors . . . to decide what process is due. [Citation.] This flexible balancing standard considers "'(1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the [dignity] interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'"' (*In re Malinda S.* (1990) 51 Cal.3d 368, 383; see *In re James Q.* (2000) 81 Cal.App.4th 255, 267.)

"'The extent to which a father may participate in dependency proceedings and his rights in those proceedings are dependent on his paternal status.'" (*Christopher M.*, *supra*, 113 Cal.App.4th at p. 159, citing *In re Paul H.* (2003) 111 Cal.App.4th 753, 760.) Due process for an alleged father over the course of dependency proceedings requires only that he "'be given notice and "an opportunity to appear and assert a position and attempt to change his paternity status."'" (*Christopher M.*, at p. 160.) The corollary to this rule is that a father must inform his appointed counsel, the social worker or the court if he intended to request paternity testing in order to change his paternity status *before* the date of the hearing.

18

"'Alleged fathers have less rights in dependency proceedings than biological and presumed fathers. [Citation.] An alleged father does not have a current interest in a child because his paternity has not yet been established.'" (*Christopher M.*, *supra*, 113 Cal.App.4th at p. 159.) Thus, in *Christopher M.*, the reviewing court concluded that the alleged father was not entitled to a contested hearing on the selection and implementation of a permanent plan, unless and until the alleged father was able to elevate his status to that of a biological or presumed father. (*Id.*, at p. 160.) But while due process concepts at the jurisdictional, dispositional, and reunification stages of the dependency include a right to seek to raise a father's status from alleged to biological or presumed father, at the selection and implementation hearing, that is no longer an option because the proceedings have gone beyond protecting familial relationships and are focused on the needs of the child for permanency and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

As an alleged father, Father 1 did "'not have a current interest'" in the issues that were before the juvenile court at that hearing—that is, whether the minor was adoptable and whether any exceptions to adoption applied. (*Christopher M.*, *supra*, 113 Cal.App.4th at p. 160, citing *In re O. S.* (2002) 102 Cal.App.4th 1402, 1406.) Neither reunification nor paternity is an issue before the juvenile court at the section 366.26 hearing. (*In re Ninfa S.*, *supra*, 62 Cal.App.4th at p. 811.) Father 1 should have sought to change his paternal status before the date of the hearing. Considering Father 1 was aware of the dependency at least by October 2, 2024, he had time to inform the relevant parties of his intentions before the hearing, but failed to do so.

19

Having determined that Father 1 lacked a due process right to be physically present at the hearing where he did not execute the prisoner's statement and was merely an alleged father, we turn to the provisions relating to continuances in general to determine if the court abused its discretion.

Although continuances are discouraged in dependency cases (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 604 (*Giovanni F.*)), the juvenile court may continue a dependency hearing upon a showing of good cause, provided the continuance is not contrary to the interest of the child. (See § 352, subd. (a); *In re Emily D.* (2015) 234 Cal.App.4th 438, 448.) "The determination of whether good cause exists is left to the sound discretion of the trial court." (*In re Maurice E.* (2005) 132 Cal.App.4th 474, 481.) "*Stipulations between counsel of parties, convenience of parties, and pending criminal or family law matters are not in and of themselves good cause.*" (*Jeff M. v. Superior Court* (1997) 56 Cal.App.4th 1238, 1242.)

While the definition of good cause is less than clear and is subject to judicial discretion, what is clear is that an alleged father has no current interest in establishing his biological paternity at a hearing designed to select and implement a permanent plan of adoption for the child. Having failed to establish an adequate interest in pursuing paternity at this stage of proceedings, due to his failure to request DNA testing when first contacted in prison by the social worker, or to contact his appointed attorney, a continuance for that purpose is not supported by good cause.

We review an order denying or granting a continuance for abuse of discretion. (See *Giovanni F.*, *supra*, 184 Cal.App.4th at p. 605 [reviewing order denying

20

continuance].) '"To show abuse of discretion, the appellant must demonstrate the juvenile court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice."' (*In re Emily D.*, *supra*, 234 Cal.App.4th at p. 448, citing *In re Joey G.* (2012) 206 Cal.App.4th 343, 346.)

We find no abuse of discretion. Father 1 waited until the date of the selection and implementation hearing to inform the parties and the court that he had reconsidered his previous denial of paternity. His position at the time of the hearing was in direct contradiction to information he provided to the social worker several weeks earlier, at which time he stated he was incarcerated at the time conception would have occurred making it impossible for him to be the father. He does not appear to have contacted the social worker after his initial contact with her to inform her that his previous denial of paternity was mistaken and that he wished to have a paternity test. Nor is there any indication he attempted to contact his appointed attorney or the court prior to the hearing on this issue.

We find no abuse of discretion.

2. ***A Conditional Affirmance is Appropriate to Clarify the Inquiry Efforts made by the Department Respecting Maternal Relatives***

Mother argues the trial court's finding that ICWA did not apply is not supported by substantial evidence. Mother asserts that the Department conducted an investigation prior to filing a section 300 petition, at which stage there was no inquiry of anyone other than Mother, and it failed to inquire of other extended relatives. Mother acknowledges limited inquiry that took place after Mother provided information about possible Indian

21

ancestry at the jurisdictional stage, but that the Department failed to inquire of extended family members. Father 1 joins Mother's argument. We review the adequacy of the ICWA inquiry as of the stage of the proceeding at which the issue is presented for our review because it is a continuing duty. For this reason, we determine whether the duty of inquiry was satisfied or not at the stage from which the appeal is taken. However, we agree that the record is unclear on the issue of whether the Department conducted adequate further inquiry over the course of the proceedings, after new information came to light.

ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family. (25 U.S.C. § 1902; see *In re Isaiah W.* (2016) 1 Cal.5th 1, 7–8.) In any "proceeding for the foster care placement of, or termination of parental rights to, an Indian child," the Indian custodian and the Indian child's tribe have the right to intervene and may petition the court to invalidate any foster care placement of an Indian child made in violation of ICWA (25 U.S.C., §§ 1911, subd. (c), 1914; see § 224, subd. (e)). Under ICWA, a "'foster care placement'" means "any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated." (25 U.S.C. § 1903 (1)(i).) In other words, ICWA requirements apply

only when a child is to be placed in foster care—by whatever means—not when a child remains in the parental home.

Under California law, the juvenile courts, and the child protective agencies, "(but not parents)[, have] an 'affirmative and continuing duty to inquire' whether a child in the dependency proceeding 'is or may be an Indian child.'" (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741–742, quoting § 224.2, subd. (a).) "That duty to inquire begins with [the] initial contact [citation] and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child." (*In re T.G.* (2020) 58 Cal.App.5th 275, 290, citing § 224.2, subds. (a)-(c).) Section 224.2, subdivision (a), expressly states the duty to inquire is *not limited* to asking the reporting party if they have information that the child may be an Indian child.

"Under both ICWA and California law, '"extended family member[s]"' include the child's 'grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent.'" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1053; see *In re Dominick D*. (2022) 82 Cal.App.5th 560, 567.) Upon each party's first appearance in a dependency proceeding, the juvenile court must ask each participant "whether the participant knows or has reason to know that the child is an Indian child" (*In re Kenneth D.* (2024) 16 Cal.5th 1087, 1099; § 224.2, subd. (c)) and "[o]rder the parent . . . to complete [an ICWA-020 form]." (Cal. Rules of Court, rule 5.481(a)(2)(C).)

"This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re D.F.* (2020) 55 Cal.App.5th 558, 566 (*D.F.*).) "The *duty to inquire* whether a child is an Indian

child begins with 'the initial contact,' i.e., when the referring party reports child abuse or neglect that jump-starts [the Department's] investigation. (§ 224.2, subd. (a).) [The Department's] initial duty to inquire includes asking the child, parents, legal guardian, extended family members, and others who have an interest in the child whether the child is, or may be, an Indian child." (*Id.*, at p. 566.)

"Similarly, the juvenile court must inquire at each parent's *first* appearance whether he or she 'knows or has reason to know that the child is an Indian child.' [Citation.] The juvenile court must also require each parent to complete Judicial Council form ICWA-020, Parental Notification of Indian Status. (Cal. Rules of Court, rule 5.481(a)(2)(C).) The parties are instructed to inform the court 'if they subsequently receive information that provides reason to know the child is an Indian child.'" (*D.F.*, *supra*, 55 Cal.App.5th at p. 566, fn. omitted.)

"Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.'" (*In re D.S.*, *supra*, 46 Cal.App.5th at p. 1052; *D.F.*, *supra*, 55 Cal.App.5th at p. 566.) "Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply." (*In re D.S.*, at p. 1052; *D.F.*, at p. 568.)

We generally review ICWA findings for substantial evidence. (*In re M.M.* (2022) 81 Cal.App.5th 61, 70; *In re A.M.* (2020) 47 Cal.App.5th 303, 314.) However, where the material facts at issue are undisputed, ""'we review independently whether ICWA

24

requirements have been satisfied.'"'" (*In re J.K.* (2022) 83 Cal.App.5th 498, 504, quoting *In re J.L.* (2017) 10 Cal.App.5th 913, 918.)

We agree that the Department "clearly failed to comply with its [citation] duty of initial inquiry [under ICWA] by not asking extended [paternal] family members . . . about possible Indian ancestry." (*In re Y.M.* (2022) 82 Cal.App.5th 901, 917.) The record indicates the social worker asked maternal aunt Donna G. about ancestry but contains no indication the Department ever inquired of the maternal grandmother, maternal great-grandmother, the Arkansas aunt, a maternal uncle, three other maternal relatives named by Mother,[7] or the aunt identified as Gina or Gena S., although the social worker had contact information for the maternal great-grandmother who could have provided the Department with contact information as to those relatives and other relatives with relevant information.

Because it appears that maternal relatives were available during the long course of the dependency proceedings, the Department should have made further inquiry to determine if there was Indian ancestry and whether A.D. is or may be an Indian child. (§ 224.2, subd. (b); *In re Dominick D.*, *supra*, 82 Cal.App.5th at p. 567.) Instead, the record reflects that in light of Mother's disclosure at the jurisdictional hearing, the social worker only made inquiry of maternal aunt Donna G., who denied any Indian ancestry.

---

[7] Mother did not have the contact information for the three maternal relatives, and it appears the social worker did not ask other relatives, with whom the social worker had made contact during the dependency, if they had the contact information Mother lacked. Instead, the social worker stop the inquiry because Mother did not follow through with the contact information.

By failing to determine if there were other relatives with relevant information, the Department failed to discharge its continuing duty of inquiry under ICWA.

We recognize that the tribe identified by Mother as the "Blackfoot Shanghai" Tribe may not be a federally recognized tribe. However, that information came from Mother, who may have been mistaken as to the name of the tribe. Nevertheless, on this record, we cannot say that the duty of inquiry was fully discharged.

As a consequence, the juvenile court's finding that ICWA did not apply is not supported by substantial evidence. (§ 224.2, subd. (b); *In re D.B.*, *supra*, 87 Cal.App.5th at p. 244, citing *Y.M.*, *supra*, 82 Cal.App.5th at p. 916; *In re Dominick D.*, *supra*, 82 Cal.App.5th at p. 567; *In re Ricky R.* (2022) 82 Cal.App.5th 671, 680.)

"When there is an inadequate inquiry and the record is underdeveloped, it is impossible for reviewing courts to assess prejudice because we simply do not know what additional information will be revealed from an adequate inquiry. We therefore hold that an inadequate Cal-ICWA inquiry requires conditional reversal of the juvenile court's order terminating parental rights with directions to the agency to conduct an adequate inquiry, supported by record documentation." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125.)

We conditionally reverse to give the Department an opportunity to clarify the record of the contacts it made in pursuit of the ICWA inquiry, as well as the results of those inquiries, and to ascertain if there is other information about possible Native American ancestry from a source other than Mother.

As to Father 1, because Father 1 was not deemed the biological father of A.D., there is no duty to inquire of his extended family members; and as to him ICWA does not apply because he was an unwed alleged father. Section 1903 of title 25 of the United States Code, defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) The same code provides that "'parent' means any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom. It does not include the unwed father where paternity has not been acknowledged or established." (25 U.S.C. § 1903(9).)

Here, Father 1 was never a part of A.D.'s life prior to the institution of dependency proceedings, nor during the initial stages of the case where his paternity might make a meaningful difference. As an unwed father whose paternity was not acknowledged or established, the plain language of the statute requires us to find that as to Father 1, A.D. could not acquire Indian heritage, and Father 1 is not a parent through whom A.D. could be found to be an Indian child.

Therefore, the conditional reversal is limited to inquiring of additional extended family members and documenting the responses.

### DISPOSITION

The judgment terminating Mother's parental rights is conditionally reversed. On remand, the juvenile court shall order DPSS to comply with its duty of initial inquiry under subdivision (b) of section 224.2 and, if applicable, the duty of further inquiry

27

(§ 224.2, subd. (e)) and the duty to provide notice to the proper tribes (25 U.S.C. § 1912(a); § 224.3).  After conducting further inquiry, the court shall conduct a noticed hearing to determine if the Department has conducted adequate inquiry.  If the court determines that ICWA does not apply, then the court shall reinstate the order terminating parental rights.  If the court determines that ICWA applies, then it shall proceed in conformity with ICWA and related California law.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.


We concur:

McKINSTER
J.
MILLER
J.